# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MONTRELL OLIVER, | : | |
|     Petitioner | : | |
| | : | |
| v. | : | No. 16-cv-5537 |
| | : | |
| SUPERINTENDENT TAMMY | : | |
| FERGUSON, et al., | : | |
|     Respondents | : | |

## PARTIES' AGREED STATEMENT OF FACTS AND JOINT STIPULATIONS

The Parties, through undersigned counsel, jointly move the Court to accept and adopt the following agreed statement of facts and joint stipulations derived from the record and the Parties' independent post-conviction investigations into this matter.[1]

**A.  The Charges and Trial**

1.  Oliver's conviction stems from a staged robbery and the ensuing shooting death of Juakeim Bates. Oliver was 17 years old at the time of the crime; his codefendant, Omar Goldwire, was 20 years old.

---

[1] Factual stipulations are "formal concessions . . . that have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact." *Christian Legal Soc. Chapter of the Univ. of California, Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 677–78 (2010) (quoting 2 K. Broun, McCormick on Evidence § 254, p. 181 (6th ed. 2006) (footnote omitted)).

2. According to the evidence presented at trial, Omar[2] met Bates and two other men, Johann Weldon and Larry Smith, at a gas station in West Philadelphia after 11 p.m. on February 16, 1997. N.T. 2/6/98 at 75, 131, 147-49.

3. Omar and Bates knew each other, and Omar offered to help the men buy drugs. N.T. 2/6/98 at 76-78. The men followed Omar to his house in Mantua, where Omar dropped off his car, then rode with the men around the block. N.T. 2/6/98 at 78-86, 151-54.

4. Omar and Bates knocked on the doors of two houses in an unsuccessful effort to get drugs. N.T. 2/6/98 at 86-87, 156-57. Omar then began talking with an unknown male while Bates began walking back to the car. N.T. 2/6/98 at 88-89, 157-58.

5. As Bates was returning to the car, two men, one with a shotgun and one with a handgun, approached the car, apparently demanded money, and started shooting at Bates and the other men. N.T. 2/6/98 at 88, 159. Omar then also started shooting at the car. N.T. 2/6/98 at 94-95, 160-62. Bates sustained a gunshot wound to the chest, and he was taken to the Hospital of the University of Pennsylvania, where he was pronounced dead. N.T. 2/6/98 at 162-63; N.T. 2/10/98 at 8, 23.

6. Based on a description of Omar's car, the police located Omar at a gas station on Girard Avenue about 45 minutes after the murder. N.T. 2/6/98 at 166-67; N.T. 2/9/98 at 32-34. At the time, Omar was with his brother Khalif and Khalif's friend Marcus Best. N.T. 2/9/98 at 32-34.

7. Police arrested Omar on an unrelated robbery warrant and allowed Khalif and Best to leave. N.T. 2/9/98 at 33-34. Omar gave a statement to the police

---

[2] Because numerous members of the Goldwire family are referenced in these Stipulations, they are referred to by first name for the sake of clarity.

that placed him at the scene of the homicide, although he claimed that he did not participate. N.T. 2/8/98 at 102-22.

8. Some 17 hours after Omar was arrested, police interviewed Khalif and Best. N.T. 2/9/98 at 34-35. At that time, both men implicated Oliver and a third person in the homicide. Best identified the third person as a man named Jimmy, and Khalif claimed that he did not know the third person. *See* N.T. 2/8/98 at 17-19; N.T. 3/26/97 at 108.

9. Based solely on those two statements, Oliver was arrested the following day. *See* N.T. 2/8/98 at 159-61.

10. Khalif later disavowed his police statement at the preliminary hearing. N.T. 3/26/97 at 96, 100-01, 103, 109-18.[3]

11. Oliver and Omar were both charged capitally for the crime.

12. At trial, the Commonwealth presented substantial evidence against Omar and little evidence against Oliver. The two passengers in Bates's car implicated Omar, but neither identified Oliver. N.T. 2/6/98 at 94-95, 160-62.

13. The only witness who implicated Oliver at trial was Best, who testified that he was at the Goldwire house with Khalif at the time of the murder. Best testified that Omar came home around midnight on February 17, went upstairs briefly, then left the house. N.T. 2/9/98 at 16-17, 21-22.

14. According to Best, Oliver and a man named Jimmy came downstairs shortly thereafter armed with a handgun and a shotgun, respectively, and left the house. N.T. 2/9/98 at 23-24. Best said that he heard gun shots a couple minutes later, then Oliver and Jimmy came running into the house, followed by Omar. N.T.

---

[3] Khalif also did not testify at trial. Then, in 2010, he signed an affidavit formally recanting his police statement and attesting that Oliver was not involved in the crime at issue. *See* Amended Petition for Writ of Habeas Corpus, Attachment I, ECF No. 45.

2/9/98 at 26-27. Upon their return, Best testified, Omar "was like, damn, man, damn, man, y'all F'd up, y'all F'd up like that." N.T. 2/9/98 at 28. Oliver and Jimmy then left the Goldwire residence. N.T. 2/9/98 at 28-29.

15. Both prior to trial and during trial, Oliver maintained his innocence.

16. During trial, Oliver argued that he did not match the description of the shooters and that he was not present at the time of the homicide, but the defense presented no alibi evidence. N.T. 2/11/98 at 10-12.

17. In the defense case, Oliver called Omar and Khalif's sister, Monique, who testified that Oliver was not at the Goldwire house on the night of the murder. N.T. 2/10/98 at 48.

18. Oliver's trial counsel suggested that Best and Khalif were responsible for Bates's murder and that Best lacked credibility because of his prior criminal record and because he hoped for leniency in an open case. N.T. 2/11/98 at 13-25.

19. After nearly three days of deliberations, more than a half-dozen questions, and the read-back of testimony from three witnesses, including Best, the jury convicted Oliver and Omar of first-degree murder, three counts of robbery, two counts of aggravated assault, and related offenses. N.T. 2/17/98 at 14-19.

20. Although Oliver did not testify during the guilt phase of trial, he provided a detailed account of his whereabouts on the night of the homicide during the penalty phase. N.T. 2/17/98 at 65-66.

21. More specifically, Oliver testified that he was innocent and that:

On February 16th, girl by the name of June knocked on my door. Me and my baby mom and my daughter was laying in the bed. She came upstairs. She picked my daughter up after my baby mom let her in. She's a friend of me and my baby mom. Then she asked me where was Omar live at. I said I don't know. So she said let's go try to find him. We walked out the house. We went to the Chinese store, and from the Chinese store we went to Ava's house. She went there

4

then. From there, we went from 39th and Folsom to 40th and Spring Garden and I stayed there—I left my house when the 10 o'clock news came on. And from there I stayed there the next day until 11:30 a.m., the next day which was the 17th, and I never left. I never left that night. I was we are that whole night. That's all. That's the truth right there.

N.T. 2/17/98 at 65-66.

22. During the penalty phase, Omar's mother, Thelma, also testified that she did not see Oliver in her house on the night of the homicide. N.T. 2/17/98 at 39.

23. On February 17, 1998, Oliver was sentenced to life imprisonment without the possibility of parole. In January 2019, Oliver was resentenced to 24 years to life in prison pursuant to *Miller v. Alabama*, 567 U.S. 260 (2012), as he was a juvenile at the time of the offenses.

### B. Post-Conviction Investigation

24. Oliver filed a counseled habeas petition raising seven claims in March 2019. ECF No. 45. Relevant to these stipulations, Oliver alleged that trial counsel rendered ineffective assistance for failing to investigate and present testimony from alibi witnesses, June Bell and Jadean Whitmore.

25. As a result of its subsequent independent investigation, the Commonwealth agrees that the alibi evidence from Bell and Whitmore is credible and that additional records offer support for Oliver's instant ineffectiveness claim.

26. The record reflects that trial counsel, who died in 2010, intended to present Oliver's alibi defense.

27. Trial counsel had a private investigator interview Bell, and the investigator provided a copy of that interview to the Commonwealth.

28. Trial counsel was also aware that Whitmore was a possible defense witness, since she was interviewed by the police and her statement was provided to the defense in discovery.

29. Trial counsel listed both Bell and Whitmore as potential witnesses, and, during voir dire, the prosecutor told the jury that they may be witnesses in the case. *See Response to Amended Petition for Writ of Habeas Corpus*, Exh. E, ECF No. 50; N.T. 2/2/98 at 26.

30. Trial counsel sought to have Bell, who was then-incarcerated in juvenile detention, appear for trial. The bring down order to secure Bell's appearance at trial was directed to the Youth Study Center, a juvenile-detention facility. *Response to Amended Petition for Writ of Habeas Corpus*, Exh. D, ECF No. 50.

31. However, Bell's juvenile records indicate that she was not residing at the Youth Study Center on the dates of Oliver's February 1998 trial and that she was instead living in a community-based shelter at the time.[4]

32. Despite his efforts, trial counsel made no attempt to continue the trial to have Bell brought to court when she failed to appear.

### 1. Bell and Whitmore would have testified that Oliver was elsewhere at the time of the crime.

33. Bell and Whitmore's accounts would have corroborated Oliver's statement during the penalty phase of his trial.

34. If called as a witness, Bell would have testified that she met Oliver at Whitmore's residence on the night of Bates's murder.

35. Bell would have also testified that she was with Oliver at the time of the murder and that the two spent the night at Duane Napper's apartment on

---

[4] The Commonwealth obtained copies of Bell's juvenile criminal records and provided them to Oliver's counsel pursuant to a Discovery and Cooperation Agreement. The Commonwealth also confirmed that there is no record of Bell's placement at the Youth Study Center.

6

Spring Garden Street. *Amended Petition for Writ of Habeas Corpus*, Attachment B, ECF No. 45.

36. Whitmore, who lived across the street from where the murder took place and who was Oliver's girlfriend at the time, would have also partially corroborated Bell's testimony.

37. Whitmore would have testified that Oliver left her house with Bell on the night of the murder and that Oliver returned around 11:00 a.m. the following day. *Amended Petition for Writ of Habeas Corpus*, Attachment C, ECF No. 45.

38. Whitmore would also have testified that Bell returned after Oliver's arrest and told Whitmore that Oliver had been with her at the time of the homicide. *See id.*

39. Both Parties have separately interviewed Bell and Whitmore as part of their investigations into this case. While not unimpeachable, the Parties stipulate that their testimony would have been sufficiently credible such that it likely would have raised a reasonable doubt as to Oliver's guilt.

**2. If Oliver's alibi evidence had been presented, it is reasonably likely that it would have resulted in his acquittal.**

40. The Parties stipulate that, had counsel presented available testimony from Bell and Whitmore, there is a reasonable probability that Oliver would not have been convicted of any of the charged offenses, including first-degree murder.

41. The Parties also agree that the evidence against Oliver was substantially and materially weaker than the evidence against his co-defendant.

42. Best was the only witness who implicated Oliver at trial. By comparison, several witnesses implicated Omar, and Omar's statement to the police placed him at the scene of the crime.

43. Testimony from Bell and Whitmore would also have supported the testimony of Monique (Omar and Khalif's sister), who said that Oliver was not at the Goldwire house the night of the murder. N.T. 2/10/98 at 48.

44. The jury's conduct during deliberations also supports the Parties' stipulated position that the case was a "close call." As noted in paragraph 19, the jury deliberated for about three days, asked multiple questions, and asked to re-hear Best's testimony. *See* N.T. 2/12/98 at 2-5; N.T. 2/16/98 at 2-11; N.T. 2/17/98 at 3-13.

**AGREED AND STIPULATED BY:**

| | |
|---|---|
| */s/ Joel Mandelman* | */s/ David Napiorski* |
| JOEL MANDELMAN | DAVID NAPIORSKI |
| Assistant Federal Defender | Assistant District Attorney |
| ARIANNA J. FREEMAN | Federal Litigation Unit |
| Managing Attorney, | PATRICIA CUMMINGS |
| Non-Capital Habeas Unit | Supervisor, Conviction Integrity Unit |
| Federal Community Defender Office | District Attorney's Office |
| for the Eastern District of Pennsylvania | Three South Penn Square |
| 601 Walnut Street, Suite 540 West | Philadelphia, PA 19107 |
| Philadelphia, PA 19106 | 215-686-5706 |
| 215-928-1100 | |
| | |
| *Counsel for Petitioner, Montrell Oliver* | *Counsel for Respondents* |

DATE: May 13, 2021