IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| MONTRELL OLIVER | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| BARRY SMITH, et al. | : | NO.  16-5537 |

## REPORT AND RECOMMENDATION

ELIZABETH T. HEY, U.S.M.J.                                August 27, 2021

This is a counseled petition for writ of habeas corpus filed pursuant to 28 U.S.C.

§ 2254, by Montrell Oliver ("Petitioner"), challenging his Philadelphia conviction at CP-

51-CR-0400362-1997.[1]  For the reasons that follow, I recommend that the petition be

granted as to Petitioner's claim of ineffective assistance of counsel ("IAC") for failing to

investigate and call alibi witnesses, and denied as to his remaining claims.

## I.  FACTS AND PROCEDURAL HISTORY

On February 17, 1998, a jury sitting before the Honorable John J. Poserina

convicted Petitioner of first-degree murder, three counts of robbery, two counts of

aggravated assault, and one count each of conspiracy and possessing an instrument of

crime, in connection with the killing of Juakeim Bates.[2]  See Commonwealth v. Oliver,

No. 1355 Philadelphia 1998, Memorandum at 1-3 (Pa. Super. Oct. 7, 1999) (attached to

response, Doc. 15-1 at 1-3) ("Super. Ct. Op.").

---

[1]Certain documents in the state court record bear case number 9704-0036-2/2, 9704-0037 1/1, based on the court's prior docket numbering system.  I will use the current assigned number when citing filings in the Philadelphia Court of Common Pleas.

[2]Juakeim's name also appears in the record as Juakin.

The facts and procedural history were summarized by the Pennsylvania Superior

Court on direct appeal as follows:

> On 2/1/97,[3] three young men came in to Philadelphia from Norristown to buy some drugs. They stopped at the gas station where they saw co-defendant Omar Goldwire. Goldwire had previously been in school with one of them.
>
> After meeting Goldwire, . . . they told him that they had about $3,200.00 in cash to spend. He told the driver to drive after him and follow his car. The two cars drove to the area of 3820 Wallace Street. Goldwire went inside the house and left the 3 men from Norristown outside in their own car. Omar Goldwire's brother "Calif" was inside the house talking with his friend, Marcus Best. On the second floor were 2 people named "Jimmy" and [Petitioner] . . . .
>
> Within a few minutes, Omar dropped off the keys to the vehicle he was driving and went outside to the 3 men from Norristown. They parked around the corner ostensibly to buy the drugs. Omar began knocking on the door ostensibly to arrange a drug purchase. This was actually part of the "setup" for a [r]obbery.
>
> Minutes later, [Petitioner] with a handgun and "Jimmy" . . . with a shot gun left the house. At least one of the two gunmen placed a mask over his face. Two of them went around the corner to rob the three from Norristown.
>
> The scene was outlined by the eyewitnesses as follows:
>
> Johan Weldon was the driver who had the cash and Larry Smith was in the back seat. Juakin Bates, age 20, was sitting inside the car when "a guy in the mask," dressed in a trench coat, pulled out the shotgun and pointed it at Bates.
>
> At that point, Omar Goldwire was described by Johan Weldon and Larry Smith as also having a hand gun. At that point, Johan Weldon decided to try to drive away. The shotgun was fired at Juakin Bates as he raised his arm. The shotgun rifle type projectile passed through his arm, entered

---

[3]The state court opinions use this date, but the evidence puts the events in the late-night to early-morning hours of February 16-17, 1997.

2

his body and among other thing[s] severed the aorta. He bled to death in 20 minutes.

As the car sped away other guns were fired at the car breaking windows and causing glass fragments to shatter over the driver (Weldon) and the passenger in the back seat (Smith).

Both . . . Smith (passenger) and . . . Weldon (driver) testified that several persons were shooting into their car. As soon as they spotted a police car, they stopped and told the officer that Bates had been shot. He was rushed to a hospital where he was pronounced dead.

Within a short time after the shooting, Marcus Best, who was visiting with "Calif" . . . at 3920 Wallace Street stated that Omar Edwards [sic], Jimmy and [Petitioner] all returned to the house. He heard Omar Goldwire say to the other two, "you messed up." Actual words were (you fuck up.)

They placed the shotgun inside the house near the refrigerator and [Petitioner] kept the handgun. They left the house 45 minutes later.

At that time, Omar, his brother "Calif," together with Marcus left the house to go to a local gas station at 38th and Girard Avenue. Police who received information at the crime scene arrived at the gas station and took all three of them to the Homicide Division where each gave a statement. Omar Goldwire was arrested, "Calif" and Marcus Best were released. [ Petitioner] . . . was subsequently arrested. [Marcus] Best became a witness, but "Calif" was not called as a witness.

Super. Ct. Op. at 1-3 (quoting <u>Commonwealth v. Oliver</u>, CP-51-CR-0400362-1997,

Opinion at 1-3 (Phila. C.C.P. Aug. 13, 1998) ("Trial Ct. Op.")).[4]

_____

[4]Petitioner is alternately referred to by the last names Oliver and Harris, and also by the nicknames Hoagie, Hoagie Head, and Mook. Because several individuals in this matter have the last name Goldwire, those individuals will at times be referred to by their first names. When Omar Best and "Calif' (real name, Khalif) were at the gas station following the shooting, police arrested Omar on an unrelated warrant. <u>N.T.</u> 02/09/98 at 33-34 (testimony of Best). Police interviewed Khalif and Mr. Best the next day. <u>Id.</u> at

The jury was unable to reach a unanimous penalty verdict (death versus life imprisonment), <u>N.T.</u> 02/17/98 at 132, and Judge Poserina sentenced Petitioner to mandatory life imprisonment without parole for first-degree murder, in addition to consecutive and concurrent terms on the other counts. <u>See</u> Super. Ct. Op. at 3.

Petitioner appealed alleging insufficient evidence and other grounds, but the Pennsylvania Superior Court affirmed his judgment of sentence on October 7, 1999. Super. Ct. Op. at 18. His petition for allocatur was denied by the Pennsylvania Supreme Court on February 10, 2000. <u>Commonwealth v. Oliver</u>, 751 A.2d 188 (Pa. 2000) (table).

On November 10, 2000, Petitioner filed a timely pro se petition under the Post-Conviction Relief Act ("PCRA"), 42 Pa. Cons. Stat. §§ 9541, et seq., alleging IAC for advising him not to testify based on a prior juvenile adjudication, failing to object to the prosecutor's comment that Petitioner had not provided an alibi witness, failing to object to an instruction that the jury use its common sense in determining malice, failing to request a corrupt source charge regarding Marcus Best, and failing to call Petitioner's parents and sister as character witnesses. <u>Commonwealth v. Oliver</u>, CP-51-CR-0400362-1997, Motion for Post-Conviction Relief (Phila C.C.P. Nov. 10, 2000) ("2000 PCRA Petition"). Petitioner's appointed PCRA counsel filed a no-merit letter[5] and petition to

---

34-35. It was established at the preliminary hearing that both men implicated Petitioner and a third person in the homicide. <u>N.T.</u> 03/26/97 at 108-18, 136, 148-52. Best testified at trial, <u>N.T.</u> 02/09/98 at 11, but Khalif disavowed his police statement at the preliminary hearing, <u>N.T.</u> 03/26/97 at 96, 100-01, 103, 109-18, and did not testify at trial.

[5] <u>See</u> <u>Commonwealth v. Finley</u>, 550 A.2d 213 (Pa. Super. 1988).

withdraw. Commonwealth v. Oliver, CP-51-CR-0400362-1997, Finley letter (Phila. C.C.P. Feb. 4, 2002) ("Finley Letter"). After the PCRA court dismissed the petition without a hearing, Petitioner appealed alleging that he did not receive proper notice of the Finley Letter. The PCRA court rejected this argument in its opinion recommending affirmance. Commonwealth v. Oliver, CP-51-CR-0400362-1997, PCRA Op. (Phila. C.C.P. May 17, 2002) ("PCRA Ct. 2002 Op.").[6] However, the Superior Court agreed with Petitioner and sent the matter back to the PCRA court. Commonwealth v. Oliver, No. 1223 EDA 2002, Memorandum, at 5 (Pa. Super. May 7, 2003) ("2003 Super Ct. Op.") (attached to response, Doc. 15-2 at 2).

On remand, the PCRA court provided Petitioner with notice, and then dismissed the PCRA petition for lack of merit on July 11, 2003. Commonwealth v. Oliver, CP-51-CR-0400362-1997, Order (Phila. C.C.P. July 11, 2003) ("2003 PCRA Ct. Order"); see also Commonwealth v. Oliver, CP-51-CR-0400362-1997, PCRA Op. (Phila. C.C.P. Oct. 9, 2003) (opinion of Judge Poserina recommending affirmance of dismissal on appeal) ("PCRA Ct. 2003 Op."). The Superior Court dismissed Petitioner's appeal on March 5, 2004, for failure to file a brief. Commonwealth v. Oliver, No. 2732 EDA 2003, Order (Pa. Super. Mar. 5, 2004) ("2004 Super. Ct. Order").

---

[6]In his pro se statement of matters complains of on appeal, Petitioner added claims not contained in his PCRA petition, including a claim of IAC for failing to investigate a known alibi witness and introduce alibi evidence at trial. Commonwealth v. Oliver, CP-51-CR-0400362-1997, Concise Statement of Matters Complained of on Appeal, ¶ 2.g. (Phila. C.C.P. May 6, 2002) ("1925 Statement").

On March 13, 2006, Petitioner filed a second PCRA petition, again alleging IAC. Commonwealth v. Oliver, CP-51-CR-0400362-1997, Motion for Post-Conviction Collateral Relief (Phila. C.C.P. filed Mar. 13, 2006). On October 24, 2006, the PCRA court dismissed the petition as untimely. Commonwealth v. Oliver, CP-51-CR-0400362-1997, Order (Phila. C.C.P. Oct. 24, 2006) (signed docket entry). Petitioner appealed to the Superior Court, which affirmed the dismissal on May 22, 2008. Commonwealth v. Oliver, 3202 EDA 2006 (Pa. Super. May 22, 2008) ("2008 Super. Ct. Op.") (attached to response, Doc. 15-3 at 3).

On September 26, 2016,[7] Petitioner initiated the present action by filing a pro se petition for writ of habeas corpus, alleging various claims including violation of his due process and equal protection rights, lack of subject-matter jurisdiction, improper jury instructions, actual innocence, violation of his Eighth Amendment rights under Miller v. Alabama, 567 U.S. 460 (2012),[8] and IAC. Docs. 1 & 3. The Honorable Mitchell S. Goldberg referred the matter to me to prepare a Report and Recommendation ("R&R"). Doc. 4.

---

[7]The original petition was docketed on October 21, 2016, but this court employs the "mailbox rule," deeming the petition filed when given to prison authorities for mailing. Burns v. Morton, 134 F.3d 109, 113 (3d Cir. 1998) (citing Houston v. Lack, 487 U.S. 266 (1988)). The original petition indicates that it was signed and placed for mailing on September 26, 2016, Doc. 1 at 8, and therefore, I will assume that Petitioner gave the petition to prison authorities for mailing on that date.

[8]In Miller, the Supreme Court held that mandatory life sentences imposed on juvenile offenders violate the Eighth Amendment. 567 U.S. at 470. At the time of the incident, Petitioner was seventeen years of age.

In my initial R&R dated August 3, 2017, I recommended that, despite Petitioner having been sentenced in violation of Miller, he had come to federal court too late and his petition should be dismissed as untimely. Doc. 17. The Federal Community Defender Office for the Eastern District Office of Pennsylvania ("Federal Defender") advised the court of its availability to assist Petitioner in raising his Miller claim, and Judge Goldberg appointed that office to represent Petitioner and referred the matter back to me for a determination regarding the applicability of Miller. See Docs. 21, 22, 24. On October 23, 2017, Respondents conceded that Petitioner was entitled to relief under Miller, and requested that his federal habeas proceedings be stayed so Petitioner could return to state court to litigate his Miller claim. Doc. 26. I issued a Supplemental R&R recommending that the request be granted, Doc. 30, and on November 16, 2017, Judge Goldberg approved and adopted the Supplemental R&R and stayed the matter pending the conclusion of the state court proceedings. Doc. 30.

On February 2, 2018, Petitioner filed a PCRA petition in state court, seeking relief under Miller. Commonwealth v. Oliver, CP-51-CR-0400362-1997, Criminal Docket (Phila C.C.P. Nov. 10, 2000) ("Docket Sheet") (entry dated Feb. 2, 2018). On January 18, 2019, the Philadelphia Court of Common Pleas vacated Petitioner's sentence of life without parole and resentenced him on the murder count to a prison term of twenty-four years-to-life. Id. (entry dated Jan. 18, 2019); see also Doc. 41. No further penalty was imposed on the remaining convictions. Doc. 41 (parties' joint status report).

On March 18, 2019, Petitioner filed a counseled amended habeas petition raising seven grounds for relief:

1. Petitioner is actually innocent of the charged offenses and his conviction and sentence represent a fundamental miscarriage of justice;

2. The Commonwealth violated Petitioner's right to due process by failing to disclose that Jimmy Whitney was incarcerated at the time of the homicide and by failing to correct false testimony from Marcus Best regarding Jimmy Whitney;

3. IAC for failing to investigate and present exculpatory evidence about the identity of Jimmy Whitney;

4. IAC for failing to investigate and present evidence from four key witnesses: June Bell, Jadean Whitmore, Duane Napper, and Shallom Roberts;

5. IAC for advising Petitioner not to testify;

6. IAC for failing to file a motion to sever Petitioner's trial from Omar Goldwire's trial; and

7. Petitioner suffered prejudice from the cumulative effect of the above constitutional violations.

Doc. 45 at 5-12 (headings A-G).[9]  On September 20, 2019, Respondents filed a response arguing that Petitioner's first claim is non-cognizable and the remaining claims are procedurally defaulted and/or meritless, except that Respondents waived procedural default and agreed to an evidentiary hearing as to the fourth claim (failure to call witnesses).  Doc. 50.[10]

---

[9]Unless otherwise noted, all citations will be to the court's ECF pagination.

[10]On May 20, 2019, the parties filed a joint motion to stay these proceedings, citing the Federal Defender and the Pennsylvania Innocence Project's referral of this matter to the Conviction Integrity Unit ("CIU") of the Philadelphia District Attorney's Office.  Doc. 46.  Judge Goldberg denied the motion on May 21, 2019.  Doc. 47.

On December 12, 2019, Petitioner sought leave to amend the petition and file a supplemental memorandum of law, which I granted without prejudice to any procedural defenses Respondents might raise. Docs. 62, 63. In the amended petition and memorandum that followed, Petitioner raised two additional claims which I will assign sequential numbers;

> 8. The Commonwealth used its peremptory strikes in a discriminatory manner in violation of <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986), and trial counsel was ineffective for failing to object at the time; and

> 9. IAC for failing to impeach Marcus Best with the false name he initially gave to police.

Docs. 62-1 & 64. On March 25, 2020, Respondents filed a response arguing that Petitioner's two additional claims are procedurally defaulted and meritless. Doc. 66.

By Order dated October 2, 2020, I scheduled an evidentiary hearing to be held in February 2021 to address the merits of Petitioner's IAC claim regarding the failure to present alibi witnesses and the default and merits of his IAC and due process claims regarding Jimmy Whitney's incarceration at the time of the crime. Doc. 69.[11] I later rescheduled the evidentiary hearing for June 2021. Doc. 70.

On May 7, 2021, Respondents filed a supplemental response to the amended petition, conceding that Petitioner was entitled to conditional relief on his claim of IAC

---

[11]I initially determined that a hearing was proper as to Petitioner's IAC claim for failing to call alibi witnesses based on Respondents' affirmative waiver of procedural default as to that claim, and that as for Petitioner's IAC claim related to Jimmy Whitney, a hearing was proper to determine whether cause existed to excuse the procedural default of that claim by operation of <u>Martinez v. Ryan</u>, 566 U.S. 1 (2012). I will further address the propriety of holding a hearing <u>infra</u> at 16-20.

for failing to present alibi witnesses, and stating that the parties would submit stipulations obviating the need for the evidentiary hearing. Doc. 73 at 2. Shortly thereafter, the parties filed a document entitled Parties' Agreed Statements of Facts and Joint Stipulations, memorializing the parties' agreed-upon facts supporting their joint position that trial counsel rendered ineffective assistance for failing to investigate and present testimony from alibi witnesses. Doc. 75 ("Stipulations").[12] The matter is now ripe for review.

## II. STARDARDS OF REVIEW[13]

### A. Exhaustion and Procedural Default

Before the federal court can consider the merits of a habeas claim, a petitioner must comply with the exhaustion requirement of section 2254(b), by giving "the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." O'Sullivan v. Boerckel, 526

---

[12]The pertinent section of the Stipulations will be discussed in detail in the Discussion, starting infra at 27.

[13]The statute of limitations does not bar review. Petitioner's conviction became final in 2000, followed by a timely PCRA proceeding ending in 2004, an untimely PCRA petition filed in 2006, and this habeas petition filed in 2016. An obvious question arises as to the timeliness of the petition, and Respondents initially asserted the time bar. Doc. 15. Nevertheless, in response to the counseled amended petition, Respondents affirmatively waived any statute of limitations defense, citing "the particular circumstances of this case." Doc. 50 at 5. Although Respondents do not address timeliness in response to the additional amendment raising two more claims, Doc. 66, Respondents were obviously aware of the limitations issue, and I conclude that they again affirmatively waived the defense. In light of that waiver, I will not inquire further into the timeliness of the petition. See Day v. McDonough, 547 U.S. 198, 210-11 (2006) ("should a State intelligently choose to waive a statute of limitations defense, a district court would not be at liberty to disregard that choice").

U.S. 838, 845 (1999). In addition, federal constitutional claims must be fairly presented to the state courts, meaning that the petitioner must present the same factual and legal basis for the claim to the state court to put the state court "on notice that a federal claim is being asserted." McCandless v. Vaughn, 172 F.3d 255, 261 (3d Cir. 1999).

A petitioner's failure to exhaust his state remedies may be excused in limited circumstances on the ground that exhaustion would be futile. Lambert v. Blackwell, 134 F.3d 506, 518-19 (3d Cir. 1997). Where such futility arises from a procedural bar to relief in state court, the claim is subject to the rule of procedural default. See Werts v. Vaughn, 228 F.3d 178, 192 (3d Cir. 2000). In addition, if the state court does not address the merits of a claim because the petitioner failed to comply with the state's procedural rules in presenting the claim, it is also procedurally defaulted. Coleman v. Thompson, 501 U.S. 722, 750 (1991).

The court may address a procedurally defaulted claim only if the petitioner establishes cause for the default and prejudice resulting therefrom, or that a failure to consider the claim will result in a fundamental miscarriage of justice. Werts, 228 F.3d at 192 (citing McCandless, 172 F.3d at 260; Coleman, 501 U.S. at 731). To meet the "cause" requirement to excuse a procedural default, a Petitioner must "show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." Id. at 192-93 (quoting and citing Murray v. Carrier, 477 U.S. 478, 488 (1986)). To establish prejudice, a petitioner must prove "'not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional

dimensions.'" Bey v. Super't Greene SCI, 856 F.3d 230, 242 (3d Cir. 2017) (quoting

United States v. Frady, 456 U.S. 152, 170 (1982) (emphasis in original)).

In order for a petitioner to satisfy the fundamental miscarriage of justice exception

to the rule of procedural default, the Supreme Court requires a petitioner to show that a

"'constitutional violation has probably resulted in the conviction of one who is actually

innocent.'" Schlup v. Delo, 513 U.S. 298, 327 (1995) (quoting Carrier, 477 U.S. at 496).

To satisfy this standard, a petitioner must present new, reliable evidence of factual

innocence. Id. at 324.

Additionally, with respect to certain claims of ineffectiveness of trial counsel, a

petitioner can rely on post-conviction counsel's ineffectiveness to establish cause to

overcome a default. Martinez, 566 U.S. at 13. In Martinez, the Supreme Court carved

out a narrow exception to the rule that ineffective assistance of PCRA counsel does not

provide cause to excuse a procedural default, holding that "[i]nadequate assistance of

counsel at initial-review collateral proceedings may establish cause for a prisoner's

procedural default of a claim of ineffective assistance at trial." Id. at 9. The Court

explained that "if counsel's errors in an initial-review collateral proceeding do not

establish cause to excuse the procedural default in a federal habeas proceeding, no court

will review the prisoner's claims." Id. at 10-11. Thus, the Martinez exception applies

only to claims of ineffective assistance of trial counsel where the errors or absence of

post-conviction counsel caused a default of these claims at the initial-review post-

conviction proceeding. Id. at 14; see also Norris v. Brooks, 794 F.3d 401, 405 (3d Cir.

2015) ("Martinez made very clear that its exception to the general rule . . . applies only to

attorney error causing procedural default during initial-review collateral proceedings, not collateral appeal.").  In addition, a petitioner must "demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that . . . the claim has some merit."  Martinez, 566 U.S. at 14.[14]

### B.    Merits Review

Under the federal habeas statute, review is limited in nature and relief may only be granted if (1) the state court's adjudication of the claim "resulted in a decision contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or if (2) the adjudication "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1)-(2).  Factual issues determined by a state court are presumed to be correct, rebuttable only by clear and convincing evidence.  Werts, 228 F.3d at 196 (citing 28 U.S.C. § 2254(e)(1)).

The Supreme Court has explained that "[u]nder the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case

_____

[14]Whether a claim has "some merit" is judged by the standard to obtain a certificate of appealability.  Martinez, 566 U.S. at 14 (citing Miller-El v. Cockerell, 537 U.S. 322, 327 (2003) ("A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.")).

differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). With respect to "the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. The "unreasonable application" inquiry requires the habeas court to "ask whether the state court's application of clearly established federal law was objectively unreasonable." Id. at 409. As the Third Circuit has noted, "an unreasonable application of federal law is different from an incorrect application of such law and a federal habeas court may not grant relief unless that court determines that a state court's incorrect or erroneous application of clearly established federal law was also unreasonable." Werts, 228 F.3d at 196 (citing Williams, 529 U.S. at 411).

For claims that were not addressed by the state courts in the first instance, this deferential standard of review does not apply. Appel v. Horn, 250 F.3d 203, 210 (3d Cir. 2001) ("when . . . the state court has not reached the merits of a claim thereafter [properly] presented to a federal habeas court, the deferential standard . . . do[es] not apply"). In those circumstances, claims are reviewed using the de novo standard of review. See Jacobs v. Horn, 395 F.3d 92, 100 (3d Cir. 2005) ("In cases where the AEDPA standards of review do not apply, federal habeas courts apply pre-AEDPA standards of review."). "[T]he state court's factual determinations are still presumed correct, rebuttable only upon a showing of clear and convincing evidence." Appel, 250 F.3d at 210 (citing 28 U.S.C. § 2254(e)(1)).

## C.     __Ineffectiveness of Counsel__

Several of Petitioner's claims allege IAC.  Such claims are governed by <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), in which the Supreme Court set forth a two-pronged test for the consideration of IAC claims.  First, the petitioner must show that counsel's performance was deficient, which "requires showing that counsel made errors so serious that counsel was not functioning as 'counsel' guaranteed the defendant by the Sixth Amendment."  <u>Id.</u> at 687.  In other words, a "defendant must show that counsel's representation fell below an objective standard of reasonableness."  <u>Id.</u> at 688.  This assessment requires the court to consider counsel's conduct at the time, under all the circumstances, without the "the distorting effects of hindsight."  <u>Id.</u> at 689.  Second, the petitioner must show that the deficient performance prejudiced the defense, which "requires showing that counsel's errors were so serious as to deprive the defendant of a fair [and reliable] trial."  <u>Id.</u> at 687.  In determining prejudice, the question is whether there is a reasonable probability that the result of the proceeding would have been different.  <u>Id.</u> at 694; <u>see also</u> <u>Smith v. Robbins</u>, 528 U.S. 259, 285-86 (2000) (prejudice prong turns on whether there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different").

## III.   __DISCUSSION__

As previously noted, Petitioner raises seven grounds in his counseled amended habeas petition, and two additional claims in later amendment.  Docs. 45 & 62-1.  I will first address Ground Four -- IAC for failing to present alibi witnesses, which is the subject of the parties' Stipulations -- and then address the remaining claims seriatim.

A.    **Ground Four: IAC for Failing to Investigate and Present Testimony of Alibi Witnesses**

Petitioner argues that trial counsel was ineffective for failing to investigate and present testimony from four witnesses -- June Bell, Jadean Whitmore, Duane Napper, and Shallum Roberts. Doc. 45 at 10-11. Petitioner raised this claim in his second PCRA appeal, which the state courts found to be untimely. 2008 PCRA Super. Ct. Op. at 4, 7. This would normally result in a default of the claim, but Respondents have affirmatively waived the default and concede the merits of the claim. Doc. 50 at 16-20.[15] I will first address the propriety of accepting evidence on this claim, and then turn to the merits under a de novo standard of review. Jacobs, 395 F.3d at 100.

1.  Taking of evidence on habeas review

With respect to the facts supporting this IAC claim, Respondents invited an evidentiary hearing, Doc. 50 at 1, 16, and later reached stipulations with Petitioner. Doc. 75. However, the habeas statute limits the circumstances in which a federal court may hold an evidentiary hearing, and the parties do not address whether such circumstances are present here. For these purposes, I see no distinction between holding an evidentiary hearing and accepting factual stipulations.

The statute provides that "[i]f the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on

---

[15]As with timeliness, default can be waived as a defense to a habeas claim. See generally Bennett v. Super't Graterford SCI, 886 F.3d 268, 280-81 & n.11 (3d Cir. 2018); 28 U.S.C. § 2254(b)(3) ("A State shall not be deemed to have waived the exhaustion requirement . . . unless the State, through counsel, expressly waives the requirement.").

the claim unless the applicant shows that (A) the claim relies on . . . (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2254(e)(2). In assessing whether the applicant has met the opening clause of this section, "a failure to develop the factual basis of a claim is not established unless there is a lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." Williams v. Taylor, 529 U.S. 420, 432 (2000). A petitioner who was not diligent must show the two listed elements to obtain a hearing (facts could not have been discovered through due diligence and no reasonable factfinder would have found guilt), whereas a petitioner who did not fail in diligence need not make that showing. Id. at 435. If a hearing is permitted, a decision whether to hold a hearing is within the discretion of the court. Morris v. Beard, 633 F.3d 185, 196 (3d Cir. 2011).[16]

---

[16]Because the state courts did not review Petitioner's IAC claim, the rule barring a hearing to supplement the state-court post-conviction record does not come into play. See Cullen v. Pinholster, 563 U.S. 170, 185 (2011) ("If a claim has been adjudicated on the merits by a state court, a federal habeas petition[er] must overcome the limitation of § 2254(d)(1) on the record that was before that state court."); Brown v. Wenerowicz, 663 F.3d 619, 629 (3d Cir. 2011) ("[i]n light of Pinholster, district courts cannot conduct evidentiary hearings to supplement the existing state court record" where state court denied relief on merits); Brown v. Bickell, No. 12-2400, 2014 WL 5880071, at *7 (E.D. Pa. Nov. 12, 2014) ("habeas court is not prohibited from considering evidence outside the state court record" in reviewing claims not adjudicated on merits by state court).

The diligence threshold does not require diligence throughout the proceedings. Thus, where a petitioner has, albeit belatedly, attempted to raise the issue and seek a hearing in the state court, but that request was rejected on the basis of a procedural rule that was later held invalid, this court should find that the petitioner exercised diligence. Morris, 633 F.3d at 193-94 (although it "strains credulity to say that [petitioner] 'diligently' developed his conflict-of-interest claim in the traditional sense of the word," by waiting from his 1983 trial until a 1996 PCRA petition to raise it, "we are constrained to agree" that he was "'diligent' in the technical sense" because "he sought an evidentiary hearing in the manner required by state law"); Lark v. Sec'y Pa. Dept. of Corr., 645 F.3d 596, 614-17 (3d Cir. 2011) (applying Morris). As the Supreme Court has stated, a finding of diligence turns on whether a petitioner "made a reasonable attempt" to pursue his claim "in light of the information available at the time." Williams, 529 U.S. at 435.

Although Petitioner certainly missed opportunities to raise this IAC claim in the state courts, I conclude that he was diligent in attempting to do so. This issue of potential alibi witnesses arose during Petitioner's first PCRA proceedings. His pro se petition did not state an IAC claim for failure to investigate and present an alibi defense, although it did raise an IAC claim for not objecting when the prosecutor improperly mentioned lack of alibi witnesses in closing argument. 2000 PCRA Petition ¶ 9.II. His appointed PCRA counsel did not thereafter raise the claim either, instead filing a Finley letter addressing only those issues presented in the pro se petition. However, in his pro se statement of matters raised on appeal Petitioner included an IAC claim based on trial counsel's "fail[ure] to investigate a known alibi witness and introduce alibi evidence at trial." 1925

18

Statement § 2.g.  In his opinion recommending affirmance, Judge Poserina referenced a letter dated October 31, 2001, from PCRA counsel to Petitioner which does not appear in the record but that was provided to Judge Poserina.  PCRA Ct. 2002 Op. at 5.  In that letter, counsel stated that Petitioner's mother said that she had "reports from a Private Investigator," and that as a courtesy counsel would wait a week before submitting his Finley letter.  Judge Poserina noted that the report "never materialized," and that after repeatedly delaying the PCRA proceedings, counsel concluded that the report "just did not exist."  Id. at 7-8.[17]  Because Petitioner's appeal was dismissed by the Superior Court for failure to file a brief, the Superior Court did not address this issue.

Petitioner also did not raise the IAC/alibi claim in his second PCRA, identifying only a claim that his lawyer should have objected to the prosecutor's closing argument. However, in a motion filed on April 25, 2006, he asked the court to dismiss his PCRA petition without prejudice, stating that he had not been provided counsel and his PCRA had not been completed, and that if not allowed to dismiss he would not be able to show his actual innocence.  Commonwealth v. Oliver, CP-51-CR-0400362-1997, Motion to Dismiss PCRA Without Prejudice (Phila C.C.P. Apr. 25, 2006).  Then on August 24, 2006, he moved for extension of time to amend, stating that he was awaiting several notarized statements that would fall under newly discovered evidence and asking for sixty days to amend.  Commonwealth v. Oliver, CP-51-CR-0400362-1997, Motion for

---

[17]Judge Poserina repeated this same explanation in his October 9, 2003 opinion after the Superior Court remanded the case.  PCRA Ct. 2003 Op. at 7-8.

Extension of Time to Amend PCRA (Phila C.C.P. Aug. 24, 2006). The docket does not indicate that either motion was ruled on, and the petition was dismissed as untimely. In his pro se appeal, according to the Superior Court's opinion, Petitioner claimed that his "trial counsel was ineffective for failing to investigate known alibi witnesses and introduce alibi evidence at trial." 2008 Super. Ct. Op. at 4. Petitioner also faulted his first PCRA counsel for failing to review the record and the PCRA court for dismissing his first PCRA petition without a hearing. Id. at 3. The Superior Court affirmed the lower court's decision that the second PCRA was untimely. Id. at 4-7.[18] Thus, Petitioner tried albeit unsuccessfully to raise his IAC/alibi claim. Under these circumstances, I conclude that it is permissible for this court to hold a hearing, and in lieu of that to accept the parties' Stipulations. See Han Tak Lee v. Glunt, 667 F.3d 397, 406 (3d Cir. 2012) ("If [a petitioner] pursued his claim with diligence in the state court, but the claim remained undeveloped, he is eligible for an evidentiary hearing."); Morris, 633 F.3d at 196 (in considering whether to hold a hearing, court should "focus on whether a new

---

[18]Petitioner sought to overcome the time bar by relying on the Pennsylvania Supreme Court's decision in Commonwealth v. Collins, 888 A.2d 564 (Pa. 2005), which held that an IAC claim was independent of an underlying claim of error for purposes of whether an issue is barred from review on the ground that it was previously litigated. 2008 Super. Ct. Op. at 6 & n.4. In Petitioner's case, the Superior Court ruled that, even if Collins established a new constitutional right within the meaning of the PCRA, his petition was still untimely because Petitioner filed his second petition more than sixty days after Collins was decided. Id. at 6 (citing 42 Pa. C.S.A. § 9545(b)(1)(iii)). The court also rejected Petitioner's proffer that he tried to get the help of a fellow inmate following dismissal of his first PCRA petition but that the inmate was released and the parole authorities prevented the inmate from assisting Petitioner. Id. at 6-7 n.6.

evidentiary hearing would be meaningful, in that a new hearing would have the potential to advance the petitioner's claims").

### 2. Merits review

To prevail in an ineffectiveness claim for failing to investigate and present witness testimony, a petitioner must demonstrate that the witnesses at issue were willing and available to testify and what testimony each would have provided. <u>Zettlemoyer v. Fulcomer</u>, 923 F.2d 284 (1991). Such a claim is also subject to the familiar two-pronged <u>Strickland</u> test of inadequate performance and prejudice. 466 U.S. 668. Consideration of the claim should start with a review of the evidence, including the parties' Stipulations.[19]

As summarized at the outset, <u>supra</u> at 2-3, the case concerned the shooting death of Juakeim Bates in the early morning hours of February 17, 1997. Based on the

---

[19]As previously noted, the Commonwealth's continued investigation of this matter culminated in Stipulations filed by the parties. Factual stipulations are "formal concessions . . . that have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact," <u>Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of the L. v. Martinez</u>, 561 U.S. 661, 677-78 (2010) (citation omitted), and are not legal conclusions. The Stipulations are divided into sections. First, they address the charges and trial based on the testimony at trial and sentencing, Stipulations ¶¶ 1-23, and next they address the parties' subsequent investigation of Petitioner's IAC claim for failing to investigate and present testimony from alibi witnesses Ms. Bell and Ms. Whitmore. <u>Id.</u> ¶¶ 24-44. The Stipulations are not necessary to aid the court's own review of the trial evidence and are relevant only for the narrow fact issues at issue here, namely the availability and content of witness testimony that was not presented at trial. As to these points, the Stipulations represent evidence that would have been presented at the hearing had it gone forward. To the extent the Stipulations reflect the parties' legal conclusions, they carry no weight. <u>See</u> <u>Natividad v. Beard</u>, No. 08-cv-0449, 2021 WL 3737201, at *2 (E.D. Pa. Aug. 24, 2021) ("The Commonwealth's concession and the parties' agreement that petitioner should be granted the requested relief of a new trial does not relieve the Court of its own duty to consider [petitioner's] petition under federal and constitutional law.").

prosecutor's opening statement, the Commonwealth's theory was that late on February 16, Mr. Bates and his friends Johann Weldon and Larry Smith, who were all from Norristown, drove into Philadelphia and while there stopped at a gas station in West Philadelphia and saw Omar (Goldwire). <u>N.T.</u> 02/04/98 at 177-78.[20] Mr. Bates and Omar recognized one another from school some years before, and Mr. Bates told Omar that he and his friends had money and were looking to buy drugs. <u>Id.</u> at 178-79. Omar devised a plan to rob them, and instructed them to follow him as he drove to his house at 3820 Wallace Street. <u>Id.</u> at 179-80, 181. The three men waited in their car as Omar went inside to find his best friend, Petitioner, and a third man only identified as Jimmy. <u>Id.</u> at 180. Omar retrieved a handgun and went back outside and got into the back of the men's car, and directed them to drive to the 3800 block of Mt. Vernon Street, explaining that his friend Mack lived there and would sell them drugs. <u>Id.</u> at 181-82. At Omar's instruction the men knocked on some of the doors asking for Mack without success. <u>Id.</u> at 183-84. As Mr. Bates was trying to get back into the front passenger seat of the car, two men wearing ski masks came around the corner, one carrying a shotgun and the other a handgun. <u>Id.</u> at 184-85. The man with the handgun positioned himself at the rear of the car, and the other, who the prosecutor argued was Petitioner, used the shotgun to shoot out the rear window and then shot Mr. Bates at point-blank range as he was getting into the car. Further shots were fired as Mr. Weldon drove their car away. <u>Id.</u> at 185-86. The prosecutor told the jury that the victims would not be able to identify Petitioner, because

_____

[20]As previously noted, members of the Goldwire family are sometimes referenced herein by just their first names.

the shooter wore a mask, but that police got his name from Khalif and Marcus Best, whose evidence would establish his guilt.  Id. at 193, 196.

The prosecutor called both surviving victims (Johann Weldon and Larry Smith) to testify, and their testimony was consistent with the prosecutor's outline, although Mr. Smith testified that he only saw one masked man.  N.T. 02/06/98 at 75-99 (Mr. Weldon), 146-69 (Mr. Smith).[21]  Neither identified Petitioner, and both identified Omar as the man they met that at the gas station that evening and one of the men who fired at them, although Mr. Weldon had previously identified a photograph of Omar's brother Khalif as the man at the gas station.  Id. at 75, 92-93, 123 (Mr. Weldon); 148-49, 161 (Mr. Smith).

Another witness, Ricky Smith (no relation to Larry Smith), also largely corroborated the prosecutor's narrative, although he also did not identify Petitioner (referred to as "Mook") as involved in the events.  Ricky Smith was close friends with Jadean Whitmore, referred to as "Jay," who was Petitioner's girlfriend at the time.  N.T. 02/06/98 at 7.  He testified that at about 1:00 a.m. he came to visit Petitioner and Ms. Whitmore where they lived together on the 3800 block of Mr. Vernon Street.  Id. at 8-9. While he was waiting outside their door he saw a car park in the middle of the street and two men, one of whom he identified as Omar, got out and knocked on doors on the street and he heard someone answer that the man they were looking for was not there.  Id. at 9-14.  Omar then came to the same door where Ricky Smith was waiting for Petitioner and

---

[21]Larry Smith testified that the only man he saw wearing a face mask was the man who came to the side of the car carrying a shotgun, and that Omar had a handgun and did not wear a mask.  N.T. 02/06/98 at 164.

Ms. Whitmore, and they knocked but no one answered. Id. at 15-16, 44, 67. As Omar

returned to the car, Ricky Smith saw two masked men coming from the direction of

Wallace Street, one armed with a shotgun and the other a handgun. Id. at 17-19. The

man with the shotgun fired as the car started to pull out. Id. at 20. He recognized the

sound of shotgun rounds and also handgun rounds. Id. at 24-25. He crouched out of the

way of the bullets, and saw Omar crouching behind a car. Id. at 26-27, 40. Shortly

thereafter he forced his way into Petitioner and Ms. Whitmore's house as he could not get

an answer to his call, and found Ms. Whitmore home but not Petitioner. Id. at 32. Ricky

Smith testified that Petitioner was not one of the masked men based on their height and

build. Id. at 36.

The key evidence against Petitioner was the testimony of Marcus Best. N.T.

02/09/98 at 11-101. Best explained that he and Khalif were best friends, that Petitioner

and Omar were best friends, and that Omar was Khalif's older brother. Id. at 11-14. He

testified that on that day he was at Omar's house at 3820 Wallace Street, that Omar left at

about 9:30 p.m. in a car Best described as Khalif's car, and returned at about midnight

followed by another car. Id. at 15-17, 20. Omar went upstairs, at which time Petitioner

(referred to as "Hoagie Head") and Jimmy were also upstairs. Id. at 17, 20-21. He could

not identify Jimmy other than that he was from North Philadelphia and knew Omar. Id.

at 17-18. Omar came back downstairs and left, and few moments later Petitioner and

Jimmy also left, Petitioner carrying a handgun and wearing a black trench coat and

Jimmy carrying a shotgun. Id. at 22-25, 48. A few moments later he heard shots, then

Petitioner and Jimmy came back running each carrying the same guns they left with, and

Omar also returned.  Id. at 26-27.  Best testified that he did not see if Omar had a gun, but heard Omar say to Petitioner and Jimmy, "y'all F'd up."  Id. at 28-29.  About forty-five minutes after the shooting, Best, Omar, and Khalif were in the same car at a gas station when police approached and arrested Omar.  Id. at 32-34.  Best was questioned the next day by police and implicated Petitioner and Omar.  Id. at 34.

Omar's statement to police after his arrest was read into evidence at trial.  N.T. 02/09-98 at 113-121.  He admitted that he knew Mr. Bates from school and that Mr. Bates and his friends talked about having money to buy cocaine.  Id. at 113-14.  Omar was trying to locate Mack when three men he did not know came running out of an alley blasting guns.  Id. at 116.  The statement did not implicate Petitioner.[22]

The prosecutor also presented evidence of Petitioner's arrest.  Officers attempted to arrest him on the morning of February 18, 1997, where he was living at 3825 Mt. Vernon Street, but no one was present.  N.T. 02/09/18 at 138-40.  Other officers arrested

---

[22]Detective Richard Harris testified that he recovered two spent shell casings from the street at the scene of the crime.  N.T. 02/05/98 at 80.  Police Officer James Caldwell testified that he recovered a bullet and five lead metal fragments from inside the car Mr. Bates was in, and that the car's rear window was shattered and there were several bullet holes in the car.  N.T. 02/09/98 at 172, 175, 177.  Detective Richard Bova testified that three .45 caliber rounds of ammunition were found inside the Goldwire house on Wallace Street, along with .380 caliber and 9mm ammunition and a shotgun.  Id. at 131.  Police Officer Muhammad Abdur-Rahim provided ballistics testimony, stating that he could not say with certainty that the two spent cartridge cases found in the street were fired from the same firearm due to corrosion, but confirming that they were both fired from a .45-caliber semiautomatic handgun.  Id. 02/09/98 at 212, 218.  Officer Abdur-Rahim also testified that the lead fragments found in the car were consistent with being from a shotgun rather than a handgun, but that he could not say that they came from the recovered shotgun.  Id. at 221-23, 225-26.

Petitioner later that day at his mother's residence.  Id. at 159-61.  At the time of his arrest, Petitioner stated that his name was Montrell Andre Harris, and that his nickname was "Hoagie."  Id. at 160.

Khalif was also questioned by police the day after the shooting, but the jury did not hear his statement and he did not testify at trial.  The jury also did not hear that Khalif implicated Petitioner, as the prosecutor had outlined in opening.[23]

Neither Petitioner nor Omar testified at trial.  Petitioner's counsel called Monique Goldwire, the sister of the Goldwire brothers.  N.T. 02/10/98 at 45-86.  On the evening of February 16, 2017, she was at their home at 3820 Wallace Street watching television.  Id. at 46.  Also in the home were Khalif, his girlfriend, and Marcus Best, but Monique did not see Petitioner in the house any time that night, nor did she see a person named Jimmy.  Id. at 47-48, 52.  She testified that sometime after about 1:00 a.m., Omar came to the door and dropped off car keys which he asked Monique to give to their mother, stating that he was going to go "around the corner with these boys to Mack house and I'll be back."  Id. at 51.  She eventually went upstairs to bed and did not see Omar further or hear any shots.  Id. at 52, 81.  There was no rebuttal evidence.

Petitioner's counsel asserted Petitioner's innocence in closing argument, arguing at length about inconsistencies and shortcomings in the evidence and the unreliability of

---

[23]Khalif disavowed his police statement at the preliminary hearing, see Stipulations ¶ 10 (citing N.T. 03/26/97 at 96, 100-01, 103, 109-18), and did not testify at Petitioner's trial.  Id. at n.3.  In 2010, Khalif signed an affidavit formally recanting his police statement and attesting that Petitioner was not involved in Bates murder.  Id.; Khalif Goldwire Affidavit, Doc. 45-1 at 43 ("Khalif Affidavit").

Best's testimony (including based on a crimen falsi prior conviction), but did not have

any evidence upon which to argue that Petitioner was elsewhere at the time of the events.

N.T. 02/11/98 at 7-25, 29-34. The prosecutor closed by summarizing the evidence

against Omar, noting that both victims identified him as did Ricky Smith and Marcus

Best. Id. at 44-68. In attempting to persuade the jury of Petitioner's identity as the

shotgun shooter, he relied on Best's testimony, arguing why it should be believed despite

inconsistencies with his preliminary hearing testimony, and that Petitioner was the right

height based on the witness descriptions. Id. at 73, 78-93. The prosecutor also argued

that Petitioner's arrest in another part of town showed that he was "laying low" after the

shooting. Id. at 93-94. The prosecutor argued that Petitioner's connection to Omar

corroborated Best's testimony, that Monique's testimony that he was not in the house that

night should be disbelieved, and that the shooting which took place in front of his house

and his disappearance from the area all supported his guilt. Id. at 103-09.

Following deliberations, the jury convicted Petitioner and Omar of first-degree

murder, three counts of robbery, two counts of aggravated assault, and related offenses.

N.T. 2/17/98 at 14-19.

The Stipulations address the parties' investigations of Petitioner's IAC claim for

failing to investigate and present testimony from alibi witnesses Ms. Bell and Ms.

Whitmore. Stipulations ¶¶ 24-44. The parties stipulate that trial counsel, who died in

2010, intended to present Petitioner's alibi defense. Id. ¶ 26. Trial counsel had a private

investigator interview Ms. Bell, and the investigator provided a copy of the interview to

the prosecution. Id. ¶ 27; see Alibi Notice and Investigation Interview of June Bell dated

Nov. 24, 1997, attached to the response at Exhs. F (Doc. 50-5 at 4) & G (Doc. 50-6) ("Bell Interview"). Additionally, trial counsel knew that Ms. Whitmore was a possible defense witness because the police interviewed her and the statement she gave was provided to the defense in discovery. Stipulations ¶ 28; see Investigation Interview Record of Jadean Whitmore dated Feb. 17, 1997, attached to the response at Exh. B (Doc. 50-2) ("Whitmore Statement"). Moreover, trial counsel listed both Ms. Bell and Ms. Whitmore as potential witnesses, and during voir dire the prosecutor told prospective jurors that they might be called as trial witnesses. Stipulations ¶ 29. Finally, trial counsel attempted to have Ms. Bell appear for trial and sent an order to the Youth Study Center to secure her appearance, but she did not receive the order because she was instead living in a community-based shelter. Id. ¶¶ 30 (citing June Bell Subpoena, attached to response at Exh. D (Doc. 50-4) ("Bell Subpoena")), 31.[24] Counsel made no attempt to continue the trial or have Ms. Bell brought to court when she failed to appear. Id. ¶ 32.

The parties maintain that Ms. Bell's and Ms. Whitmore's accounts would have at least partially corroborated Petitioner's statement made during the penalty phase of the trial as to his whereabouts on the night of Bates's murder. Stipulations ¶¶ 33, 36; see infra at 30-31. Ms. Bell and Ms. Whitmore provided affidavits to Plaintiff's habeas

---

[24]Respondents obtained Ms. Bell's juvenile criminal records which contained no record of her placement at the Youth Study Center. Stipulations ¶ 31 n.4. As Respondents point out, Doc. 50 at 19, the subpoena contains two clerical errors. Specifically, it references an order date of February 8, 1998, it directs that Ms. Bell be transported from the Youth Study Center to court on *June* 9, 1998, and February 10, *1993*. Bell Subpoena.

counsel which counsel attached to the amended petition. Affidavit of June Bell dated Feb. 14, 2018, Doc. 45-1 at 21 ("Bell Aff."); Affidavit of Jadean Whitmore dated May 7, 2018, Doc. 45-1 at 23 ("Whitmore Aff."). Both asserted that they were willing to testify at Plaintiff's trial. If called as a witness, Ms. Bell would have testified that she met Petitioner at Ms. Whitmore's residence on the night of the Bates murder, and that the two spent the night at Duane Napper's apartment on Spring Garden Street. Stipulations ¶¶ 34-35 (citing Bell Aff.).[25] Ms. Whitmore, who lived across the street from the murder scene and was Petitioner's girlfriend at the time, would have testified that Petitioner left her house with Ms. Bell on the night of the murder and that Petitioner returned around 11:00 a.m. the following day. Id. ¶ 37 (citing Whitmore Aff.). Ms. Whitmore would also have testified that Ms. Bell returned after Petitioner's arrest and told Ms. Whitmore that Petitioner had been with her at the time of the Bates murder. Id. ¶ 38 (citing Whitmore Aff.). This information is roughly consistent with what she told police. For example, when interviewed by police at 6:40 p.m. on February 17, 1997, Ms. Whitmore stated that she fell asleep before 11:00 p.m. the prior evening, that at some point Ricky Smith (whom she referred to as her brother) woke her up and asked if she heard shooting, which

---

[25]Ms. Bell refers to Mr. Napper as "Kasheem." In her November 1997 investigation interview, Ms. Bell stated that she and Petitioner were at 40th and Spring Garden Streets at the time of the crime, see Bell Interview, Doc. 50-6 at 3, and in her February 2018 affidavit she refers to this location as "the room Kasheem and I were staying in at around 40th and Spring Garden Streets." Bell Aff., Doc. 45-1 at 21. In a letter dated July 29, 1998, private investigator Tyrone Parker informed Petitioner's counsel that he "took a statement from Duane Napper (aka) Kasheem" eight days earlier, and attached Mr. Napper's statement. See 07/29/98 letter, Doc. 45-1 at 26 ("Parker Letter").

she did not.  See Jadean Whitmore Interview Record dated Feb. 17, 1997, Doc. 50-2.

Ricky Smith told her that a man from a gray car knocked on a house on the same block as

Ms. Whitmore's, and when the man returned to the car two armed men with long coats

came out from a lot and started shooting at the gray car and then ran back into the lot.

Ms. Whitmore also reported that her boyfriend, Petitioner, came home at 11:00 a.m., and

when she told him about the shooting, told her that someone who lives across the street

from the Goldwire house said that the two shooters came from that house and returned to

it.  Id. at 1-2.

Although the affidavits were obtained by Petitioner's habeas counsel, the parties

separately interviewed Ms. Bell and Ms. Whitmore as part of their investigations, and

while acknowledging that their testimony would not be unimpeachable, the parties

maintain "that their testimony would have been sufficiently credible such that it likely

would have raised a reasonable doubt as to [Petitioner's] guilt."  Stipulations ¶ 39.  The

parties also point out that the jury deliberated for about three days, sought clarifications,

and asked to re-hear Best's testimony, suggesting the case was a "close call."  Id. ¶¶ 19,

44; see, e.g., N.T. 2/17/98 at 3-13 (requesting clarification of degrees of murder).[26]

The Stipulations are consistent with information that can be gleaned from the

record and documents submitted by the parties.  Although he did not testify during the

guilt phase of the trial, during the penalty phase Petitioner provided the following account

of the night of Bates's murder:

---

[26]The parties also cite to jury requests for clarification made on February 12 and
16, 1998, although the court does not have Notes of Testimony for those days.

On February 16th, girl by the name of June knocked on my door. Me and my baby mom and my daughter was laying in the bed. She came upstairs. She picked my daughter up after my baby mom let her in. She's a friend of me and my baby mom. Then she asked me where was Omar live at. I said I don't know. So she said let's go try to find him. We walked out the house. We went to the Chinese store, and from the Chinese store we went to Ava's house. She went there then. From there, we went from 39th and Folsom to 40th and Spring Garden and I stayed there—I left my house when the 10 o'clock news came on. And from there I stayed there the next day until 11:30 a.m., the next day which was the 17th, and I never left. I never left that night. I was we are that whole night. That's all. That's the truth right there.

N.T. 02/17/98 at 65-66. Also during the penalty phase, Omar's mother Thelma testified that she did not see Petitioner in her house on the night of the murder. Id. at 39.

The affidavits from Ms. Bell and Ms. Whitmore at least partially corroborate Petitioner's claim that he was at Ms. Whitmore's house until late on the evening of February 16, 1997, and that Petitioner and Ms. Bell left together, and Ms. Bell further states that she was with Petitioner for the remainder of the evening at Mr. Napper's residence. See Bell Aff.; Whitmore Aff. Additionally, an unsworn statement by Mr. Napper similarly asserts that he was with Petitioner for the remainder of that same evening. See Duane Napper Statement dated Jul. 21, 1998, Doc. 45-1 at 25 ("Napper Statement"). These accounts generally corroborate each other as well as Petitioner's testimony at the penalty phase of his trial.

Additionally, potential witness Shallom Roberts produced an affidavit explaining that he heard the gunshots and saw two men running into the Goldwire house, which was located roughly across the street from his residence. He stated that "I saw the faces of the

two guys and I know for sure neither was [Petitioner.] The police never asked me if they looked like [Petitioner]." Shallom Roberts Affidavit dated Feb. 27, 2018, Doc. 45-1 at 29-30 ("Roberts Aff.").[27] This affidavit is consistent with the statement Mr. Roberts gave to the police in 1997, wherein the officers did not press him for detailed descriptions of the men he saw and Mr. Roberts indicated that he did not want to be involved in the investigation. See Investigation Review Record of Shallom Roberts dated Feb. 19, 1997, attached to response at Exh. C (Doc. 50-3) ("Roberts Statement").

Finally, although no alibi evidence was presented at trial, the prosecutor noted in his closing that Petitioner answered the phone when Ricky Smith called Jaydean Whitmore's house at 11:30 p.m., but that Petitioner was not present at the house -- which was roughly across the street from the scene of the crime -- only about an hour or so later. N.T. 02/11/98 at 76. Contrary to the prosecutor's statement in closing that this testimony "completely destroyed any possible chance that [Petitioner] has [an] alibi in this case," id., it is generally consistent with Petitioner's position that he was at neither the Goldwire nor Ms. Whitmore's house when the murder occurred, as corroborated by Ms. Bell, Ms. Whitmore, and Mr. Napper. Thus, the evidence counsel failed to present was absolutely crucial for Petitioner's defense.

While counsel intended to present Petitioner's alibi defense and attempted to have Ms. Bell testify, it remains unclear why counsel made no attempt to continue the trial or have Ms. Bell brought to court when she failed to appear. Similarly, it is unclear why

---

[27]According to Mr. Roberts, Petitioner's face is "very distinctive; that is why his nickname is Hoagie Head!" Roberts Aff. ¶ 2.

counsel failed to present the testimony of Ms. Whitmore, Mr. Napper, or Mr. Roberts. Although Ms. Whitmore and Mr. Roberts provided police statements, both contend that counsel never interviewed them prior to trial. Additionally, Mr. Napper's statement is dated July 1998, approximately five months after Petitioner's trial, which suggests that counsel did not interview him prior to trial.

Trial counsel's failure to present these alibi witnesses was unreasonable. As noted, trial counsel was aware of Ms. Bell and Ms. Whitmore, as for example counsel had a private investigator interview Ms. Bell and provided a copy of the interview to the prosecution, see Stipulations ¶ 27, and the police interviewed Ms. Whitmore and her police statement was provided to the defense in discovery. Id. ¶ 28. Moreover, trial counsel listed them as potential defense and alibi witnesses in correspondence with the Commonwealth prior to trial, see Letters dated 09/15/97, 11/21/97 & 11/28/97, attached to response at Exh. E (Doc. 50-5 at 1, 3 & 4), and the prosecutor mentioned their names as potential witnesses during voir dire. N.T. 02/04/98 at 9. Similarly, Mr. Roberts had given a police statement on February 19, 1997, see Roberts Statement, and therefore counsel was presumably aware of Mr. Roberts' potential testimony. Finally, although the record does not disclose a pretrial statement from Mr. Napper, Petitioner's trial counsel had been informed that Mr. Napper was the individual Ms. Bell referred to as "Kasheem," who she said spent the night with her and Petitioner. See Parker Letter, Doc. 45-1 at 26. Thus, Petitioner has satisfied the first prong of the Strickland analysis.

Under these circumstances, the prejudice prong of counsel's ineffectiveness is straightforward; had counsel obtained testimony from multiple available and willing

witnesses that Petitioner was elsewhere at the time of the Bates murder, their testimony would likely have the changed the outcome of the trial, particularly in view of the fact that only one witness, Marcus Best, identified Petitioner as a participant in the shooting. Accordingly, I will recommend that Petitioner be granted relief as to this IAC claim.

Although I recommend that the writ be granted as to this claim, I will address his other claims in the interest of completeness.

**B.    Ground One: Actual Innocence Claim is Non-Cognizable**

In his first claim, Petitioner argues that he is actually innocent of the charges against him.  Doc. 45 at 5-8.  Respondents counter that a stand-alone claim of actual innocence is not cognizable on habeas review.  Doc. 50 at 11-12.

Although a credible claim of innocence can provide a gateway through which a petitioner can present a constitutional violation -- a basis to excuse a petitioner's failure to comply with the habeas limitations period, see McQuiggin v. Perkins, 569 U.S. 383, 392-93 (2013), or to excuse a procedural default, see Coleman, 501 U.S. at 750 -- actual innocence is not a stand-alone basis for habeas relief in a non-capital case.  See Herrera v. Collins, 506 U.S. 390, 400 (1993) ("[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation").  Thus, Petitioner's first claim does not provide a basis for habeas relief.

**C.    Grounds Two and Three Relating to Jimmy Whitney**

Petitioner's second and third claims both turn on his allegation that the third robber, identified by Marcus Best as "Jimmy," was an individual named Jimmy Whitney,

who was incarcerated at the time of the robbery and murder of Mr. Bates. In Petitioner's view, this information supports both a due process claim for the prosecutor's failure to disclose the fact of Mr. Whitney's incarceration to the defense in violation of Brady v. Maryland, 373 U.S. 83 (1963), and an IAC claim for trial counsel's failure to investigate Mr. Whitney. Doc. 45 at 8-10. Respondents counter that both claims are procedurally defaulted and meritless. Doc. 50 at 12-16.

By way of background, and as previously noted, the evidence supported an inference that three persons participated in the robbery and murder of Mr. Bates. The only person to identify Petitioner as well as the third robber was Mr. Best, who reported to police and testified that Petitioner and "Jimmy" followed Omar Goldwire out of the house armed with guns and returned shortly after the shooting. Best Police Statement; N.T. 02/09/98 at 17-29. However, neither Mr. Best nor any other witness or evidence identified "Jimmy."

Petitioner cites testimony provided by Thelma Goldwire, Omar's mother, during the penalty phase of trial, to establish his identity. Doc. 45 at 8-9. On direct examination by Omar's counsel Mr. Moldovsky, Thelma testified that an individual named "Jimmy" was never in her home that night:

> Q. Now, that night when you got in at 1:00 [from work], did you see Omar?
>
> A. Yes, I did.
>
> Q. Was he pretty upset?
>
> A. No.

Q.  Did he tell you anything?

A.  No.  All he did is ask his brother to go to the store with him.

Q.  Which brother is this?

A.  Khalif.

Q.  Khalif was there?

A.  Yes.

Q.  Was Marcus Best there?

A.  Yes.

Q.  Was Montrell Oliver there?

A.  Oliver never in my house.

Q.  Do you know anybody named Jimmy who comes to your house?

A.  Jimmy was never in my house.  Ain't no Jimmy.

N.T. 2/17/98 at 38-39.  The prosecutor Mr. Gilson then cross-examined Thelma regarding

"Jimmy":

Q:  You say there is no person named Jimmy?

A:  There ain't no person named Jimmy.

Q:  Do you know a person by the name of Jimmy Whitney?

A:  Jimmy Whitney been in jail a long, long time.  He ain't out now.  He's still in jail and he wasn't here that night because he been in jail.

Q:  Your son was arrested with Jimmy for committing robberies in the past, wasn't he?

MR. MOLDOVSKY:  Objection, Your Honor.

[A:]  Not that I know of.

THE COURT:  Overruled.

MR. MOLDOVSKY:  He's talking about stipulated too [sic]
in jail February 17th.  The DA checked that out and knows
that to be a fact.  Is that correct, Mr. Gilson?

MR. GILSON:  No, I don't know that.

MR. MOLDOVSKY:  Detective Richard Harris checked that
out.  He was in jail when this happened.

THE COURT:  What's next?

N.T. 2/17/98 at 41.[28]

Petitioner maintains that the Commonwealth knew or should have known that

Jimmy Whitney was incarcerated and failed to disclose this information to the defense

and failed to correct Mr. Best's testimony that Jimmy was present, and also maintains

that trial counsel failed to investigate and learn that the Jimmy in question was Jimmy

Whitney and that he was incarcerated, and that if counsel had he would have been able to

demonstrate the falsity of Mr. Best's testimony.  Doc. 45 at 8-10.  Petitioner concedes

that he never presented these claims to the state courts and that they are therefore

unexhausted, and also that they are defaulted as the state courts would no longer entertain

a challenge to his conviction.  Doc. 45 at 5.

---

[28]Petitioner attached to his amended petition a criminal docket sheet for James
Hall, which indicates that one of his aliases is "Jimmy Whitney."  See Doc. 45-1 at 34.
The docket sheet confirms that Mr. Hall/Whitney was incarcerated at the time of Mr.
Bates' robbery and murder.  Id. at 34-39.  However, there is nothing to suggest whether
the docket sheet refers to the same "Jimmy" referred to by Mr. Best.

As previously explained, Petitioner can overcome default by establishing cause for the default and prejudice resulting therefrom.  <u>Werts</u>, 228 F.3d at 192.  His only argument as to cause is that his initial post-conviction counsel was ineffective in failing to raise these claims, relying on <u>Martinez</u>.  Doc.  45 at 5.  Although <u>Martinez</u> presents a possible ground to excuse the default of an underlying claim of IAC, it cannot save his defaulted due process/<u>Brady</u> claim.  <u>Martinez,</u> 566 U.S. at 14 (exception applies only to certain claims of ineffective assistance of trial counsel).  Nevertheless, the court can consider the merits and reject a claim on that ground, rather than rely on default.  <u>See</u> 28 U.S.C. § 2254(b)(2) (writ may be denied on the merits notwithstanding failure to exhaust state court remedies).  Both the due process and IAC claims lack merit.[29]

Petitioner has not established either that the prosecution failed to disclose, or that his trial counsel failed to discover, that the "Jimmy" referred to by Marcus Best was the same "Jimmy Whitney" who was incarcerated at the time of Mr. Bates' murder.  First, as to the due process claim, <u>Brady</u> requires the prosecution to disclose evidence favorable to the accused "where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  373 U.S. at 87.  To prove a <u>Brady</u> violation, a defendant must show that the evidence was (1) favorable in that it is exculpatory or impeaching of the government's evidence, (2) suppressed by the state, and (3) material such that the defendant was prejudiced by the government's suppression.  <u>Strickler v. Greene</u>, 527 U.S. 263, 280 (1999).  "The focus [in considering a <u>Brady</u> claim]

---

[29]Because I decide the claims on the merits, it was not necessary to take evidence to consider cause under <u>Martinez</u> as originally contemplated.  <u>Supra</u> n.11.

is disclosure by the prosecutor, not diligence by the defense." Dennis, 834 F.3d at 290. As noted, to make out his IAC claim, Petitioner must establish that his counsel made errors so serious that his representation fell below an objective standard of reasonableness. Strickland, 466 U.S. at 689.

Accepting that the above-quoted exchange during the penalty phase testimony of Thelma Goldwire suggests that the Goldwires knew a person named Jimmy Whitney who was incarcerated in February 1997, and even assuming that the police were aware that an individual named Jimmy Whitney was in jail for a separate crime at the time Mr. Bates was robbed and murdered, neither of these facts establish that Jimmy Whitney was the "Jimmy" referred to by Mr. Best in his statement and testimony. No testimony or other evidence of record links "Jimmy" to Jimmy Whitney, either in the underlying record or in this habeas proceeding, leaving only Petitioner's conjecture that "Jimmy" is Jimmy Whitney. Moreover, this conjecture lacks a certain logic, because if Mr. Best, the Goldwire brothers, and Jimmy Whitney committed prior robberies together, as Petitioner avers, it is likely that Mr. Best was aware that Jimmy Whitney was serving time on a new case, and that any statement he made to the contrary would have been easily discovered. Nor is there any evidence that trial counsel had any means to discovery the identity of "Jimmy," or prove that he was the Jimmy referenced by Mr. Best. Therefore, Petitioner cannot establish the merits of either his IAC or Brady claim as to Mr. Whitney, and these claims should be denied.

**D.      Ground Five: IAC for Advising Petitioner Not to Testify**

Petitioner next argues that trial counsel was ineffective for advising Petitioner not to testify. Doc. 45 at 11-12. Respondents counter that the claim is procedurally defaulted and meritless. Doc. 50 at 7-11, 20-21.

Petitioner raised this claim in his first PCRA petition, but appointed counsel found no merit to the claim in his Finley letter, it was subsequently dismissed on the merits without a hearing by the PCRA court, and the Superior Court dismissed the appeal for failure to file a brief. 2004 Super. Ct. Order. Petitioner also raised the claim in his second PCRA appeal, which the state courts found to be untimely filed. 2008 Super. Ct. Op. at 4, 7. Because this claim was never presented to a full round of state court review, and because Petitioner cannot return to the state court to timely assert the claim, it is procedurally defaulted.

Petitioner acknowledges the default, and points to Martinez and his innocence to overcome the default. Doc. 45 at 5. Although this is an IAC claim, Petitioner cannot rely on Martinez to overcome its default. Martinez comes into play if "no court – state or federal – would ever review the defendant's ineffective assistance claims." Cox v. Horn, 757 F.3d 113, 118 (3d Cir. 2014). Here, PCRA counsel addressed this claim in his Finley letter, and explained that it lacked merit.

> First and foremost it is axiomatic that no defendant is obligated to take the stand in his own defense. . . . However, if in fact the defendant does take the stand he is stripped of his Fifth Amendment privilege and places his own credibility into question. As such the Commonwealth is free to enter evidence of his prior convictions for "Crimin Falsi", or crimes of falsehood and deceit, to diminish his

overall credibility in the eyes of the fact finder. In the instant case, [Petitioner] had been adjudicated delinquent twice as a juvenile. On June 18, 1992 (Robbery), and July 5, 1994 (Theft).

It is clear, under basic legal principles that these convictions, if entered while the defendant was an adult, would be admissible to impeach his credibility as a witness. Since these were juvenile convictions, however, the analysis runs deeper.

Turning to [42 Pa. C.S.A. § 6354], the statutory provision that controls the effect of juvenile adjudications on subsequent proceedings, we find the following language at **_subsection (b)(4)_**: (the disposition of a child under this chapter may only be used against him) *"in a criminal proceeding, if the child was adjudicated delinquent for an offense, the evidence of which would be admissible it committed as an adult."*

This language makes clear the precept that a juvenile adjudication is treated identically to an adult conviction, for evidentiary purposes, in subsequent legal proceedings. Therefore, the advice trial counsel gave to the petitioner regarding the admissibility of his prior juvenile adjudications was wholly correct.

Furthermore, trial counsel effectively and zealously advocated the suppression of these juvenile adjudications. He filed an appropriate pre-trial Omnibus Motion seeking to exclude the entry of these convictions into evidence. . . . The motion was properly denied by This Honorable Court. Since counsel cannot be found ineffective for giving correct interpretations of the law, this issue . . . is without merit.

Finley Letter at 5-6 (not numbered) (emphasis in original) (citations omitted).

Based on review of the Finley letter and the record, Judge Poserina dismissed the

PCRA petition.[30]  2003 PCRA Ct. Order; see also 2003 PCRA Super Ct. Op. at 3 (PCRA

---

[30]As explained in the procedural history, the PCRA court dismissed Petitioner's PCRA petition two times -- first without providing Petitioner with a copy of the Finley Letter, and a second time after doing so.

court's Rule 907 notice to Petitioner "stated that the court intended to dismiss the petition . . . without a hearing, on the basis of counsel's <u>Finley</u> letter"). Because the PCRA court considered Petitioner's claim on the merits, <u>Martinez</u> is not available to provide cause to excuse his procedural default. Moreover, Petitioner cannot show that the failure to address this claim will amount to a fundamental miscarriage of justice. Therefore, the claim is defaulted.[31]

### E. <u>Ground Six: IAC for Failing to File a Motion to Sever</u>

Petitioner next argues that trial counsel was ineffective for not moving to sever Petitioner's trial from that of Omar Goldwire. Doc. 45 at 12. Respondents counter that the claim is procedurally defaulted and meritless. Doc. 50 at 7-11, 21-22.

As with his other claims, Petitioner concedes that this claim was never presented to the state courts and is therefore unexhausted and procedurally defaulted, and relies on <u>Martinez</u> to excuse the default. Doc. 45 at 5. Rather than proceeding through each step of the <u>Martinez</u> analysis, I conclude that the underlying IAC claim is meritless.

---

[31]Even were I to reach the merits of the claim, Petitioner would not be entitled to relief. As PCRA counsel explained in the <u>Finley</u> letter, trial counsel attempted to exclude Petitioner's prior criminal adjudications, but Judge Poserina denied the motion. Trial counsel also argued that Petitioner's prior adjudication for receiving stolen property should be excluded because its prejudicial value outweighed its probative value, but the judge ruled that the prior adjudication would be admissible if Petitioner testified. <u>See</u> <u>N.T.</u> 02/04/98 at 157-59. Counsel therefore advised Petitioner not to take the stand, and instead challenged the sufficiency of the Commonwealth's evidence in closing. Such reasonable trial strategies are entitled to a high degree of deference, <u>see</u> <u>Strickland</u>, 466 U.S. at 689, and should not be second-guessed simply because the jury found against Petitioner. <u>See</u> <u>Roland v. Vaughn</u>, 445 F.3d 671, 681-82 (3d Cir. 2006) ("<u>Strickland</u> and its progeny make clear that counsel's choices will not be second-guessed by post-hoc determinations that a different trial strategy would have fared better.").

Petitioner's severance claim is essentially an argument that the admission of evidence in a joint trial that was not relevant to the case against Petitioner resulted in a denial of due process. Such discretionary evidentiary rulings are "best left to the province of the trial judge," Yohn v. Love, 76 F.3d 508, 525 (3d Cir. 1996), and "are not considered to be of constitutional proportion, cognizable in federal habeas corpus proceedings, unless the error deprives a defendant fundamental fairness in his criminal trial." Bisaccia v. Att'y Gen. of State of N.J., 623 F.2d 307, 312 (3d Cir. 1980) (citations omitted); see also United States v. McGlory, 968 F.2d 309, 340 (3d Cir. 1992) (to prevail on a severance claim, a defendant must "pinpoint clear and substantial prejudice resulting in an unfair trial"). To constitute a denial of fundamental fairness, the evidence admitted or not admitted "must be material in the sense of a crucial, critical, highly significant factor." Jameson v. Wainwright, 719 F.2d 1125, 1127 (11th Cir. 1983).

Here, a joint trial did not deprive Petitioner of a fundamentally fair trial. First, the defenses pursued by Petitioner and Omar were not antagonistic. To the contrary, both attempted to implicate Mr. Best and Khalif with responsibility for the robbery and shootings. See, e.g., N.T. 02/10/98 at 138 (counsel for Omar suggesting in closing that Mr. Best and Khalif were responsible); 02/11/98 at 25 (Petitioner's counsel arguing that the incident was "a Marcus Best production with Khalif"). This was certainly a reasonable trial strategy in light of Mr. Best's testimony that he and Khalif were also present in the Goldwire house immediately before and after the killing of Mr. Bates.

Second, Petitioner and Omar were both charged with conspiracy, and therefore much of the evidence applied to both defendants. See Johnson v. Tennis, 549 F.3d 296,

302 (3d Cir. 2008) ("Public interest in judicial economy favors joint trials where, as in [this] case, the same evidence would otherwise be presented at separate trials of defendants charged with a single conspiracy.").  Notably, although Petitioner identifies multiple witnesses whose testimony should have been included at trial to his benefit, he fails to identify what evidence would have been excluded had he been tried separately from Omar.[32]  Under the circumstances, it is unlikely that Judge Poserina would have granted a severance motion.  Because counsel cannot be deemed ineffective for failing to file a meritless motion, Petitioner is not entitled to relief on the merits of this IAC claim. United States v. Sanders, 165 F.3d 248, 253 (3d Cir. 1999) ("There can be no Sixth Amendment deprivation of effective counsel based on an attorney's failure to raise a meritless argument.").

F.     **Ground Seven: Cumulative Error**

Petitioner next claims that the cumulative effect of trial counsel's errors denied him a fair trial.  Doc. 45 at 12.   Respondents counter that the claim is procedurally defaulted and meritless.  Doc. 50 at 7-11, 22-23.

The Third Circuit recognizes claims of cumulative error.

> Individual errors that do not entitle a petitioner to relief may do so when combined, if cumulatively the prejudice resulting from them undermined the fundamental fairness of his trial and denied him his constitutional right to due process. Cumulative errors are not harmless if they had a substantial and injurious effect or influence in determining the jury's verdict, which means that a habeas petitioner is not entitled to

---

[32]As noted, supra at 25, Omar's police statement was read to the jury but did not implicate Petitioner.

> relief based on cumulative errors unless he can establish
> actual prejudice.

Collins v. Sec. of Pa. Dept. of Corr., 742 F.3d 528, 542 (3d Cir. 2014) (quoting Fahy v. Horn, 516 F.3d 169, 205 (3d Cir. 2008) (internal quotation marks omitted) (citations omitted)).  Thus, "[t]he cumulative error doctrine allows a petitioner to present a standalone claim asserting the cumulative effect of errors at trial that so undermined the verdict as to constitute a denial of his constitutional right to due process."  Id. (citing Albrecht v. Horn, 485 F.3d 103, 139 (3d Cir. 2007)).  This requires the court to aggregate the prejudice caused by all the instances of error or counsel's deficient performance.  See Smith v. Fisher, Civ. No. 14-2935, 2016 WL 4366974, at *11 (E.D. Pa. Aug. 15, 2016) ("In the absence of any deficient performance on the part of Petitioner's counsel . . . , such claims give rise to no constitutional prejudice that can be bundled on a cumulative review."); Pursell v. Horn, 187 F. Supp.2d 260, 363 (W.D. Pa. 2002) (cumulative review proper only after petitioner's claims surmount first prong of Strickland).

A claim of cumulative error is subject to exhaustion and procedural default.  Collins, 742 F.3d at 541.  Here the cumulative error claim is clearly unexhausted and defaulted because Petitioner never presented such a claim to the state courts and has no way to do so now.  Petitioner again asserts that the ineffectiveness of his PCRA counsel provides cause to excuse his default, implicating Martinez.  Doc. 45 at 5.

Assuming without deciding that PCRA counsel was ineffective in failing to raise this claim, it should be rejected on the merits.  Having found only one instance of trial

counsel ineffectiveness, and having recommended relief on that claim, there is no other error to cumulate.

### G. Ground Eight: Batson

In the first of two claims asserted in his counseled amendment, Petitioner argues both that the prosecutor violated <u>Batson</u> in jury selection and that his trial counsel was ineffective for failing to raise the <u>Batson</u> objection. Doc. 62-1 at 1-3; Doc. 64 at 2-11. The District Attorney responds that the substantive <u>Batson</u> claim has been forfeited and cannot be reviewed, and in the alternative that both prongs of this claim are procedurally defaulted and meritless. Doc. 66 at 4-8.

Petitioner is not entitled to review of his substantive <u>Batson</u> claim because under Third Circuit precedent, <u>Batson</u> claims are barred from federal review in the absence of an objection at trial. <u>See</u> <u>Lewis v. Horn</u>, 581 F.3d 92, 102 (3d Cir. 2009) ("Because <u>Batson</u> relies on trial judges to decide if the circumstances concerning the prosecutor's use of peremptory challenges creates a prima facie case of discrimination, we have held that a timely objection is a prerequisite to raising at <u>Batson</u> claim.") (internal quotation marks and citations omitted). Here, Petitioner failed to raise a contemporaneous objection during or immediately after jury selection. Therefore, the claim is unreviewable.

Even if the claim were not forfeited, it is procedurally defaulted, as Petitioner concedes. Doc. 64 at 2. Petitioner never presented the claim to the state courts and he can no longer do so in a timely manner. Petitioner's substantive <u>Batson</u> claim cannot be excused by <u>Martinez</u>, which only applies to certain IAC claims. Moreover, for the same

reasons previously explained, Petitioner cannot show that the failure to consider this claim would satisfy the fundamental miscarriage of justice exception under <u>Schlup</u>. 513 U.S. at 298.

The IAC portion of this claim, however, is potentially subject to <u>Martinez</u>. Rather than proceeding through each step of the <u>Martinez</u>, however, I conclude that the underlying IAC claim is meritless.

Under <u>Batson</u>, the Supreme Court reaffirmed the fundamental principle that "racial discrimination in jury selection offends the Equal Protection Clause," holding that "a defendant may establish a prima facie case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial." 476 U.S. at 85, 96. <u>Batson</u> established a three-step analysis with the initial burden on the defendant to demonstrate a prima facie case indicating discriminatory purpose by the prosecution in the exercise of its challenges, after which the burden shifts to the prosecution to supply race-neutral explanations. <u>Id.</u> at 96-97. The reviewing court must then determine if the defendant has established "purposeful discrimination." <u>Id.</u> at 98.

Here, Petitioner relies on evidence that the Commonwealth struck 71.4% of African-American venirepersons and 28.6% of non-Black venirepersons. Doc. 64 at 4-7 & nn.4-6.[33] The Third Circuit has rejected challenges to similar percentages of strikes of

---

[33]Petitioner relies on the transcripts of the jury selection (except for January 30 which are not part of the state court record and were not provided electronically by either party), as well as the prosecutor's voir dire notes and the jury questionnaires. <u>See</u> Strike Sheet, attached to Doc. 62 as Exh. A (Doc. 62-1) ("Strike Sheet"), at 6-15; Doc. 64 Exhs.

non-White venirepersons in other cases, particularly where multiple African-Americans become jurors, as here where four served on Petitioner's jury.  See, e.g., Williams v. Beard, 637 F.3d 195, 219 (3d Cir. 2011) (strike rate of 87.5% of Black venirepersons and five Blacks sitting on the jury "inconclusive at best"); Lewis, 581 F.3d at 104 (strike rate of 66.7% insufficient to make out prima facie case); Abu-Jamal v. Horn, 520 F.3d 272, 287, 293 (3d Cir. 2008) (where prosecutor had strike rate of 67% and three African-Americans were empaneled, "we have never found a prima facie case based on similar facts"), vacated on other grounds sub nom Beard v. Abu-Jamal, 130 S. Ct. 1134 (2010). Although in some cases the courts did not have additional data regarding the number of Black potential jurors, these cases suggest that a strike rate of 71.4%, without more, is insufficient to establish a prima facie Batson claim.

Petitioner argues that the prosecutor questioned Black jurors more rigorously than White jurors, but provides no examples.  Doc. 64 at 10.  Petitioner also argues that the prosecutor's Strike Sheet and voir dire questioning reveal no race-neutral grounds for the Commonwealth's peremptory strikes.  Id.  Petitioner again provides no examples, and the record actually belies this argument.  See Strike Sheet; N.T. 02/02/98, 02/03/98 & 02/04/98.  For example, the first stricken African-American venireperson identified by

---

A & B (Doc. 64 at 15-73.).  The jury questionnaires asked jurors to self-identify as White, Black, Hispanic, or Other.  Doc. 64 at 27-73.  As Petitioner explains, Doc. 64 at 6 n.6, in addition to twenty Blacks, the venire panel included one Asian struck by the Commonwealth, one Hispanic struck by the defense, and one Native American struck by the Commonwealth.  Another panelist gave his race as both Black and Hispanic, and is counted as Black for the purposes of the calculations in this case.

Petitioner -- Michelle Burton, <u>see</u> Doc. 64 at 10 -- was noted in the prosecutor's contemporary notes to have been either herself a victim of crime or connected to one, been arrested herself or had someone close to her arrested in the past, and to have connections to law enforcement. Strike Sheet, Doc. 64 at 18. When questioned about her responses, Ms. Burton testified that her brother had been a heroin addict for twenty years and been arrested for drugs and other crimes, and that her daughter had been robbed. <u>N.T.</u> 02/02/98 at 72.

Because the record does not support a prima facie case of discrimination, counsel cannot be held ineffective for failing to raise or preserve a <u>Batson</u> claim.[34] <u>See</u> <u>Sanders</u>, 165 F.3d at 253.

### H.    <u>Ground Nine: IAC for Failing to Impeach Marcus Best</u>

In the second claim asserted in his counseled amendment, Petitioner alleges IAC for failing to impeach Mr. Best concerning the false name he gave to police shortly after Bates's murder. Doc. 62-1 at 3-4; Doc. 64 at 11-12. The District Attorney responds that the claim is procedurally defaulted and meritless. Doc. 66 at 8-10. Petitioner concedes

---

[34]Petitioner also alleges an office-wide pattern and practice of discrimination by the Philadelphia District Attorney's Office. Doc. 64 at 9. However, as Respondents point out in their response to Petitioner's <u>Batson</u> claim, <u>see</u> Doc. 66 at 8 n.4, courts in this jurisdiction have consistently held that the purported evidence of such a pattern and practice is insufficient to establish that a particular prosecutor unlawfully discriminated at a particular trial. <u>See</u>, <u>e.g.</u>, <u>Clark v. Beard</u>, No, 10-3164, 2015 WL 7294971, at * 51 (E.D. Pa. Jun. 1, 2015) ("Many courts have been presented with this data . . . arising out of Philadelphia and have not found it compelling."), R&R approved and adopted, 2015 WL 727360 (E.D. Pa. Nov. 18, 2015), <u>aff'd</u> <u>sub</u> <u>nom.</u> <u>Clark v. Sec'y Pa. Dep't of Corr.</u>, 687 F.App'x 152 (3d Cir. Apr. 24, 2017); <u>Howard v. Horn</u>, 56 F.Supp.3d 709, 723-24 (E.D. Pa. 2014) (petitioner failed to present any direct link between prosecutor in his case and training video allegedly evidencing office-wide discrimination).

that this claim is unexhausted and defaulted, and again relies on <u>Martinez</u> to excuse the default.  Doc. 64 at 11.  I do not find it necessary to conduct the <u>Martinez</u> analysis, however, because I find that the claim has no merit.

Witness examination falls within the ambit of trial strategy, and as such is entitled to strong deference to the attorney's tactical decisions.  <u>See</u> <u>Sistrunk v. Vaughn</u>, 96 F.3d 666, 670 (3d Cir. 1996) (courts "'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy'") (quoting <u>Strickland</u>, 466 U.S. at 689) (internal quotation omitted).  Similarly, the fact that a tactic proved unsuccessful at trial does not render it unreasonable, <u>see</u> <u>Strickland</u>, 466 U.S. at 689, nor does the right to a fair trial translate into the right to a perfect trial.  <u>United States v. Travillion</u>, 759 F.3d 281, 291 (3d Cir. 2014).

Here, it was particularly important for Petitioner's trial counsel to throw into question the credibility of Mr. Best, the key Commonwealth witness, and it is true that counsel did not cross-examine Mr. Best as to the false name he initially gave to police after the killing of Mr. Bates.  However, counsel sought to undermine Mr. Best's credibility before the jury in multiple ways.  During the cross-examination of Mr. Best, counsel questioned him regarding his prior arrests for theft and drug dealing, his incarceration, whether the Commonwealth offered him reduced prison time in exchange for favorable testimony, and inconsistencies between his police statement and his trial testimony.  <u>N.T.</u> 02/09/98 at 37-44, 51-55.  Omar Goldwire's counsel implied that Mr.

Best could be charged with perjury for lying under oath, id. at 98-99, and both defense counsel repeatedly referred to him in bluntly unfavorable terms during closing statements to the jury. See, e.g., N.T. 02/10/98 at 133 ("the self-confessed drug dealer, the self-admitted thief, the fellow who's in prison and might get out as early as next week"), 134 ("consider that messenger, Marcus Best, that drug dealer, that thief, that scared person, and his inconsistencies and his expressions"), 147 ("drug-dealing thief," "inconsistent self-serving and deceitful testimony"); N.T. 02/11/98 at 13 (Mr. Best "has a background of crime and dishonesty"), 15 ("why shouldn't he lie?"), 17 (Mr. Best "knew he got caught in a lie"), 36 ("twist and lies").

Given this evidence and argument, it is unlikely that the additional detail that Mr. Best initially gave a false name to the police would have created a reasonable probability of a different jury verdict. As such, it cannot be said that counsel performed deficiently in questioning Mr. Best, or that counsel's chosen strategy prejudiced Petitioner. Therefore, Petitioner is not entitled to relief on this claim.

## IV.    Certificate of Appealability

Although the Commonwealth may appeal a grant of habeas corpus relief as of right, a petitioner seeking review by the circuit court must obtain a certificate of appealability ("COA"). F.R. App. P. 22(b). A petitioner requires a COA to cross-appeal an issue even when the prosecuting entity is appealing the grant of habeas relief. Mathias v. Frackville SCI, 869 F.3d 462, 474 (3d Cir. 2017).

The court may issue a COA "only if the applicant has made a substantial showing of the denial of a constitutional right" and must specify to which issues it applies. 28

U.S.C. § 2253(c)(2). The Supreme Court has held that a COA should be issued if the petitioner demonstrates that "jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." <u>Miller-El</u>, 537 U.S. at 327.

In this case, there is no basis to grant a COA on the claims for which I recommend denying habeas relief.

## V.    <u>CONCLUSION</u>

Petitioner is entitled to relief as to Ground Four (IAC for failing to investigate and present testimony of alibi witnesses), which Respondents concede, and which is warranted by the entirety of the record and the parties' submissions.

Ground One (actual innocence) is non-cognizable. Ground Two (due process violation related to Jimmy Whitney) is procedurally defaulted and meritless, and related Ground Three (IAC for failing to investigate and present exculpatory evidence regarding Jimmy Whitney) is meritless. Ground Five (IAC for advising Petitioner not to testify) is defaulted and meritless, and Ground Six (IAC for failing to file a motion to sever) is meritless. Ground Seven (cumulative error) is defaulted and lacks merit as there is no error to cumulate other than the single ground for which I recommend granting relief. Ground Eight (<u>Batson</u> claim and related IAC) is unreviewable, defaulted, and in any event meritless as to <u>Batson</u>, and the related IAC claim is defaulted and meritless. Finally, Ground Nine (IAC for failing to impeach Marcus Best) is meritless.

Accordingly, I make the following:

## R E C O M M E N D A T I O N

AND NOW, this 27th day of August, 2021, IT IS RESPECTFULLY

RECOMMENDED that the petition for writ of habeas corpus be GRANTED with respect

to Petitioner's claim of ineffective assistance of counsel for failing to investigate and

present testimony from alibi witnesses.  I further RECOMMEND that execution of the

writ be STAYED for 180 days to permit the Commonwealth to retry Petitioner.

In all other respects, I RECOMMEND that the writ be DENIED and that no

Certificate of Appealability issue with respect to Petitioner's remaining claims.

BY THE COURT:

/s/ ELIZABETH T. HEY

_____
ELIZABETH T. HEY, U.S.M.J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MONTRELL OLIVER | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| BARRY SMITH, et al. | : | NO.  16-5537 |

## O R D E R

AND NOW, this            day of                    , 2021, upon careful and

independent consideration of the petition for writ of habeas corpus and associated

briefing, and after review of the Report and Recommendation of United States Magistrate

Judge Elizabeth T. Hey, IT IS ORDERED that:

1.    The Report and Recommendation is APPROVED AND ADOPTED.

2.    The petition for writ of habeas corpus is GRANTED with respect to
      Petitioner's claim of ineffective assistance of counsel ("IAC") for failing to
      investigate and present testimony from alibi witnesses.

3.    Execution of the writ is STAYED for 180 days to permit the
      Commonwealth to retry Petitioner.

4.    In all other respects, the writ is DENIED.

5.    A certificate of appealability shall not issue.

BY THE COURT:

_____
MITCHELL S. GOLDBERG, J.