IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| MONTRELL OLIVER | : | CIVIL ACTION |
|---|---|---|
| | : | |
| v. | : | |
| | : | |
| BARRY SMITH, et al. | : | NO.  16-5537 |

## AMENDED REPORT AND RECOMMENDATION

ELIZABETH T. HEY, U.S.M.J.                                    October 27, 2022

This is a counseled petition for writ of habeas corpus filed pursuant to 28 U.S.C. § 2254, by Montrell Oliver ("Petitioner"), challenging his Philadelphia conviction at CP-51-CR-0400362-1997.  In a Report and Recommendation ("R&R") dated August 27, 2021, I recommended that the petition be granted as to Petitioner's claim of ineffective assistance of counsel ("IAC") for failing to investigate and call alibi witnesses (Ground Four) and denied as to his remaining claims.  Doc. 77.  Specifically, I concluded that counsel's failure to call June Bell and Jadean Whitmore at trial constituted deficient performance under Strickland v. Washington, 466 U.S. 668 (1984), Doc. 77 at 33.  I also considered the parties' stipulations that the witnesses' "testimony would have been sufficiently credible such that it likely would have raised a reasonable doubt as to [Petitioner]'s guilt" in concluding that petitioner met the prejudice prong of Strickland. Id. at 27-34.

By Order dated May 19, 2022, the Honorable Mitchell S. Goldberg preliminarily did not approve and adopt the R&R, and remanded the matter to me with direction to conduct an evidentiary hearing "to fully assess the testimony of" Ms. Bell and Ms.

Whitmore ("alibi witnesses"), and to issue an amended R&R.  Doc. 81.[1]  On August 24,

2022, I conducted an evidentiary hearing at which Petitioner, who has been paroled,

appeared in person, and both alibi witnesses testified.  N.T. 8/24/22 at 8-47 (Ms. Bell),

48-65 (Ms. Whitmore).[2]  I now find that the alibi witnesses testified credibly at the

hearing before me, and considering their testimony together with their prior statements in

the case and in light of the evidence at trial, conclude that had they testified, there is a

reasonable probability that the jury would not have convicted Petitioner.  I therefore

again recommend that the petition be granted as to Ground Four.

I.    **DISCUSSION**

The facts and procedural history of this case, which involves the murder of

Juakeim Bates in the early morning hours of February 17, 1997, are set forth in detail in

my August 27, 2021 R&R.  See Doc. 77 at 1-10.  Before reviewing the alibi witnesses'

testimony in light of that evidence, I must address a preliminary question concerning the

evidentiary hearing.  After Judge Goldberg remanded the matter to me to hold an

evidentiary hearing, the Supreme Court issued Shinn v. Ramirez, __ U.S. __, 142 S. Ct.

1718 (2022), which limited the authority of federal habeas courts to conduct evidentiary

hearings in the context of certain IAC claims.  Therefore, I will first address the propriety

of conducting the evidentiary hearing in light of Shinn.

_____

[1]Judge Goldberg stated that the evidentiary hearing "should be limited to evidence on the alibi claim only."  Doc. 81 at 3 n.1.

[2]The hearing transcript indicates Ms. Bell's first name as "Jdean," N.T. 8/24/22 at 48, but it clear from state court records that Ms. Whitmore spells her name "Jadean."

**A.**   <u>**Impact of <u>Shinn</u> on the Court's Ability to Conduct the Hearing**</u>

As explained more fully in my August 27, 2021 R&R, Doc. 77 at 16-21, the habeas statute limits the circumstances in which a federal court may hold an evidentiary hearing.  28 U.S.C. § 2254(e)(2).  In the R&R, I addressed whether the court could accept the parties' stipulations regarding Petitioner's IAC/alibi claim, and in deciding that the stipulations could be received I found "no distinction between holding an evidentiary hearing and accepting factual stipulations."  Doc. 77 at 16.  Although Judge Goldberg did not disturb my conclusion that evidence could properly be taken, both my R&R and his order predated the Supreme Court's decision in <u>Shinn</u>.  Therefore, I ordered the parties to address whether and to what extent <u>Shinn</u> impacted this court's ability to develop the record, <u>see</u> Doc. 82, and I now revisit the question.

The habeas statute provides that "[i]f the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that (A) the claim relies on . . . (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense."  28 U.S.C. § 2254(e)(2).  In assessing whether the applicant satisfies the first clause of this section, "a failure to develop the factual basis of a claim is not established unless there is a lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel."  <u>Williams v. Taylor</u>, 529 U.S. 420, 432 (2000).  A petitioner who was not diligent must show the two

3

listed elements to obtain a hearing (facts could not have been discovered through due diligence and no reasonable factfinder would have found guilt), whereas a petitioner who exhibited the requisite diligence need not.  Id. at 435.  A finding of diligence turns on whether a petitioner "made a reasonable attempt" to pursue his claim "in light of the information available at the time."  Id.  For the reasons set forth in the August 27, 2021 R&R, I concluded that Petitioner was sufficiently diligent in attempting to present his IAC claim to the state courts that this court could take new evidence in support of the claim without requiring him to satisfy the requirements of section 2254(e)(2).  Doc. 77 at 18-21.

In their memoranda, both parties argue that Shinn does not impact the court's ability to conduct the evidentiary hearing ordered by Judge Goldberg.  Docs. 83 & 84.  I agree.  In Shinn, the Supreme Court held that a habeas petitioner relying on Martinez v. Ryan, 566 U.S. 1 (2012), to overcome the procedural default of an IAC claim could not introduce new evidence to establish post-conviction counsel's ineffectiveness unless the petitioner could satisfy the requirements of section 2254(e)(2).  142 S. Ct. at 1728. However, the Court clarified that section 2254(e)(2) "only applies when a [person] 'has failed to develop the factual basis of a claim,'" id. at 1734 (quoting 28 U.S.C. § 2254(e)(2)), and that the requirements of that section will not apply to a defaulted claim "unless there is a lack of diligence, or some greater fault, attributable to the prisoner *or the prisoner's counsel*."  Id. at 1735 (quoting Williams, 529 U.S. at 432) (emphasis in original).

Because <u>Shinn</u> did not alter the meaning of section 2254(e)(2) to permit a petitioner to develop the record on issues as to which he was diligent in his state-court efforts, my prior analysis -- that Petitioner demonstrated the requisite diligence in attempting to raise his IAC/alibi claim and therefore is not required to satisfy the requirements of section 2254(e)(2) -- survives <u>Shinn</u>.[3]  This conclusion is consistent with those reached by other courts which have considered the impact of <u>Shinn</u> on the court's ability to conduct an evidentiary hearing on defaulted IAC claims.  <u>See</u>, <u>e.g.</u>, <u>Grays v. Smith</u>, No. 1:20-CV-02332, 2022 WL 2678766, at *19 (M.D. Pa. July 11, 2022) (section 2254(e)(2) applies only when a prisoner "has failed to develop the factual basis of a claim," meaning the petitioner must be "'at fault' for the undeveloped record in state court") (quoting section 2254(e)(2) and <u>Shinn</u>, 142 S. Ct. at 1734); <u>SCI Mothershead v. Wofford</u>, No. C21-5186, 2022 WL 2275423, at *3 (W.D. Wash. June 23, 2022) (section 2254(e)(2) does not apply to defaulted claims unless there is a lack of diligence attributable to the petitioner), <u>order granting motion to certify appeal</u>, 2022 WL 2755929 (W.D. Wash. July 14, 2022).  Therefore, an evidentiary hearing can properly be held to develop the record for Petitioner's IAC/alibi claim.[4]

---

[3]In <u>Shinn</u>, the habeas petitioners were not determined to have acted diligently and conceded that they failed to satisfy section 2254(e)(2). 142 S. Ct. at 1734.  In contrast, as explained more fully in my August 27, 2021 R&R, Petitioner's efforts satisfied the diligence requirement, obviating the need to satisfy the two elements of section 2254(e)(2).

[4]Unlike in <u>Shinn</u>, Petitioner's claim here is not defaulted because Respondents affirmatively waived that defense.  <u>See</u> Doc. 77 at 16 & n.15; <u>see also</u> Doc. 84 at 3-4 (reiterating that "the Commonwealth waived the procedural default defense in order to allow the Court to address the merits of [Petitioner]'s claim."  Petitioner argues in the

Having found that the court retained the authority to conduct an evidentiary hearing in this matter, I now turn to the testimony of alibi witnesses Ms. Bell and Ms. Whitmore.

### B.      The Credibility of the Alibi Witnesses

It is important to note that the witnesses testified in this habeas proceedings more than twenty-five years after the events occurred.  I find that both witnesses testified credibly on the material questions at issue, and that, despite the passage of time, their testimony was powerfully exculpatory -- particularly that of Ms. Bell who testified that she was with Petitioner when the murder of Juakeim Bates took place on February 17, 1997.  Ms. Whitemore was not a direct alibi witnesses, but her testimony provided valuable corroboration to Ms. Bell's.  As for each witness, I will first review their prior statement or interview that is in the record, and then their testimony.

1.      June Bell

At the August 24, 2022 evidentiary hearing, the parties entered into evidence two statements made by Ms. Bell; a defense investigator's interview conducted and signed by Ms. Bell on November 24, 1997, see Investigation Interview of June Bell (Hearing Exhs. 1 & 2) ("Bell Int."),[5] and an affidavit signed by Ms. Bell dated February 14, 2018.  See

---

alternative that section 2254(e)(2) does not bar an evidentiary hearing because of Respondents' default waiver.  Doc. 83 at 4-6.  As I find that Petitioner has demonstrated the requisite diligence in raising this claim such that the requirements of section 2254(e)(2) are inapplicable, I need not address Petitioner's alternative argument.

[5]Exhibits 1 and 2 are identical except for the redactions made on the first page. N.T. 8/24/22 at 6.  On Exhibit 1 the redactions hide Ms. Bell's entire birthday, Social Security Number, and address, and the location of the interview, whereas on Exhibit 2 the

Affidavit of June Bell (Hearing Exh. 3) ("Bell Aff.").  The parties also entered into

evidence an affidavit from Kevin Murphy, a Special Assistant with the Philadelphia

District Attorney Office's Conviction Integrity Unit ("CIU"), memorializing an interview

of Ms. Bell completed by him and two assistant district attorneys on September 9, 2019.

Hearing Exh. 4 ("Murphy Aff.").  Also admitted into evidence was a November 21, 1997

letter from an investigator working with Petitioner's trial counsel to the prosecutor,

identifying Ms. Bell as a potential defense witness (Hearing Exh. 6 at 3), and a

Philadelphia Court of Common Pleas subpoena dated February 9, 1998, directing that

Ms. Bell be transported form the Youth Study Center to court for Petitioner's trial.

Hearing Exh. 5.[6]

In her November 1997 investigation interview, Ms. Bell indicated that she was

born in 1979, Bell Int. at 1, which would make her seventeen or eighteen years old at that

time.  She knew Petitioner as "Hoagie" and they were friends who "just hung out

together."  Id. at 2.  When asked what she could tell the interviewer about the Bates

murder, Ms. Bell responded, "Nothing.  We weren't there.  We was asleep.  We was real

high Zanax."  Id.  She stated that before the shooting, she was at Petitioner's house at

38th and Mt. Vernon Streets with his "baby's mother, Hoagie, his little daughter and

---

redactions hide only the month and day of Ms. Bell's birthday and her Social Security
Number.  Exhibit 1 is the version the parties' attached to their original briefing, while
Exhibit 2 was introduced for the first time at the evidentiary hearing.

[6]As noted in my prior R&R, the subpoena contained various errors regarding the
relevant dates.  Doc. 77 at 28 n.24.

another girl Tee Tee,"[7] and that they "we left early that night" and walked around for three hours, went to a laundromat with an arcade inside, and ended up at 40th and Spring Garden Streets where they spent the night. Id. at 2-3. She estimated that they left Petitioner's house between 8:00 and 9:00 p.m. "because there was still people outside a the Chinese store at 38th and Wallace Street," and they arrived at 40th and Spring Garden "late," around 2:00 a.m., "but were so intoxicated I didn't know what time it was." Id. at 4. Ms. Bell stated that Petitioner did not leave her sight that night, and that she first heard about the shooting the next morning after Petitioner was arrested. Id. at 4-5. When asked whether she spoke to the police, Ms. Bell stated that she went to the "round house" and met with a detective, telling him that Petitioner did not kill anybody because he had been with her, but the detective asked her for exact times and said that he would not take her statement if she could not tell him the "right times," and so she left. Id. at 6.[8] She further stated that she did not show up at trial because she was not subpoenaed. Id. at 7. Lastly, when asked how she remembers the night of the murder, Ms. Bell stated, "Because [Petitioner] was arrested the very next morning when he got home [a]nd the night before we were together walking around . . . and then went home to sleep." Id.

In her February 2018 affidavit, Ms. Bell declared that she and Petitioner were friends when they were teenagers and that he did not commit the Bates murder "because

---

[7]Ms. Bell said that "TeeTee" was Ms. Whitmore's goddaughter. Bell Int. at 2. In her testimony, Ms. Whitmore identified "TT" as her young niece. N.T. 8/24/22 at 59-60.

[8]There is no indication in any of the records provided to the court of a police interview of Ms. Bell.

[he] was with me and Kasheen when it happened.  We were at the room Kasheen and I were staying in at around 40th and Spring Garden Streets.  We all slept there that night." Bell Aff. ¶ 1.[9]  Ms. Bell stated that she learned about the murder the next day at the home of Petitioner's girlfriend, Ms. Whitmore, who said that Petitioner had been arrested for the murder.  Id.  Ms. Bell became upset and told Ms. Whitmore that "on the night of the murder, [Petitioner] was with me and Kasheen."  Id.  Ms. Bell also explained that while residing at a group home called Boys Town, a "white guy . . . questioned me about the murder," saying "they were all my friends and I knew who did it," and that "if I didn't tell him who did it I would go to jail for the rest of my life for the murder."  Id. ¶ 2. When Ms. Bell told him that she did not know who committed the murder but that Petitioner did not because "he was with me at my place the whole night of the murder," the man became angry and left.  Id.  Ms. Bell did not know why she was not asked to testify at Petitioner's trial, and was willing to testify on his behalf.  Id. ¶ 3.[10]

_____

[9]As noted in my prior R&R, Kasheen (sometimes spelled Kasheem) is Duane Napper.  Doc. 77 at 29 n.25.  In a letter dated July 29, 1998, private investigator Tyrone Parker informed Petitioner's counsel that he "took a statement from Duane Napper (aka) Kasheem" eight days earlier, and attached Mr. Napper's statement.  See 07/29/98 letter, Doc. 45-1 at 26.  In the statement, Mr. Napper recalled that Petitioner, Ms. Bell, and others were in his room when he returned around 9:00 on the evening of the shooting, and that Petitioner did not leave until the following day.  Statement of Duane Napper July 21, 1998, Doc. 45-1 at 25.

[10]On the issue of availability and willingness to testify, in my August 27, 2021 R&R, Doc. 77 at 21, I overstated the principle cited in Zettlemoyer v. Fulcomer, 923, F.2d 284, 298 (3d Cir. 1991), which held only that a habeas petitioner claiming IAC for the failure to call a witness at trial cannot rely on "vague and conclusory allegations that some unspecified and speculative testimony might have established his defense."  The Third Circuit recently reiterated that Strickland does not require the court to find that the witness was willing to testify.  Williams v. Super't Mahanoy SCI, 45 F.4th 713, 720-21

According to Mr. Murphy's affidavit, on September 9, 2019, Ms. Bell told her

interviewers the following:

> [Petitioner] was with her and another boy, "Kasheen," on the
> night of the murder for which [Petitioner] was convicted.
> Bell picked up [Petitioner] at his girlfriend [Ms. Whitmore]'s
> house, and they hung out together for the rest of the night
> drinking, smoking marijuana, and goofing around at . . .
> Kasheen's place.  Bell may have also taken Xanax for her
> anxiety.  They were with each other all night and slept in the
> same bed, though their relationship was purely platonic.  Bell
> recalls that [Petitioner] was next to her when she fell asleep
> and was still there when she awoke the following morning.
> Because he was lying next to Bell, she would have known if
> he had gotten up in the night.

Murphy Aff. ¶ 3a.  After they woke up, Petitioner returned to Ms. Whitmore's house and

Ms. Bell did not see him again.  Id. ¶ 3b.  Sometime after the murder, Ms. Bell was

placed in a group home where a detective visited her and threatened that she would be

prosecuted for the Bates murder if she did not reveal who was responsible.  Id. ¶ 3c.  Ms.

Bell told the detective that she did not know who was responsible, but that Petitioner was

not involved because he was with her at the time of the crime.  Id.  She told the

interviewers that she was no longer in contact with Petitioner or the other persons

involved in the case.  Id. ¶ 3e.

At the evidentiary hearing, Ms. Bell testified that she recognized Petitioner and

had known him since high school when they were best friends, and that they last saw

---

(3d Cir. 2022) ("Absent extenuating circumstances, such as the existence of a privilege or
the witness's incapacity or death, whether a witness is ready and willing to testify is
irrelevant since defense counsel can compel testimony through a subpoena.") (quoting
Grant v. Lockett, 709 F.3d 224, 239 n.10 (3d Cir. 2013)).  The fact that Pennsylvania has
such a requirement is immaterial to the Strickland analysis.  Id. at 721.

each other when they were about sixteen years of age.  N.T. 8/24/22 at 8-9, 27.  When asked if she remembered the evening of the murder, Ms. Bell stated, "Typical October evening I believe and we were nowhere in the vicinity."  Id. at 9.[11]  She said it was a "cool day" and that she and Petitioner did not do much except hang around the neighborhood, beginning at Ms. Whitmore's house on Mt. Vernon Street from about 6:00 p.m. until 9:00 or 10:00 p.m.  Id. at 9-10.  Ms. Bell stated that those present at Ms. Whitmore's house with her and Petitioner were Ms. Whitmore and "TT," and she also believed Ms. Whitmore's and Petitioner's baby daughter was present.  Id. at 10 ("I believe [Ms. Whitmore] had had his daughter").  Ms. Bell explained that they left Ms. Whitmore's house because she "always kicked us out," saying her house was not a hang-out spot for teenagers and that she was "tired of us eating up all her food."  Id. at 10-11; see also id. at 32-33 (they left because Ms. Whitmore started an argument with Petitioner, "[p]robably because she wanted some money," which was a typical argument).

After leaving Ms. Whitmore's house, Ms. Bell, Petitioner, and another friend walked to a Chinese store and an arcade with a McDonald's on the corner, and after an unknown amount of time they left the arcade and made their way to 40th and Spring Garden Streets, about four blocks from Ms. Whitmore's house, where she, Petitioner, and her friend Kasheem spent the night.  N.T. 8/24/22 at 11, 16-17, 30-31.[12]  She stated that

---

[11]Mr. Bates' murder occurred in February, not October, and Ms. Bell was asked about the date later in her testimony.  Infra at 15 n. 14.

[12]Ms. Bell testified that she was "a runaway" who "made my own means of living" and that she stayed at the house on 40th and Spring Garden with "Mickel," who she described as an older man who was her husband "Islamically," and who owned the house.

she was intoxicated that night and that getting intoxicated and using substances was a common occurrence, id. at 28, and she testified that Petitioner did not drink alcohol and "tried to smoke weed." Id. at 29.  When asked about her statement in the Bell Interview that they arrived at 40th and Spring Garden "late . . . but we were so intoxicated I didn't know what time it was," she explained that "we" referred to her and Kasheem, and she reiterated that Petitioner had not been drinking.  Id. at 29; see also id. at 44 (explaining that the interviewer did not specify a name and she used "we" in the general sense).  On questioning by the court, Ms. Bell conceded that they may have arrived at Kasheem's house at 40th and Spring Garden earlier in the evening, explaining that she did not know the time after so many years; "I just -- I just can't remember exactly, exact times and exact dates. . . .  I can tell you like if it was morning, evening or night because of how I'm remembering what the sky looked like." Id. at 45.   Ms. Bell testified that she was with Petitioner the entire evening and night, id. at 18, and that she is "a hundred percent sure" Petitioner did not commit the Bates murder.  Id. at 19; see also id. at 42 ("[Petitioner just ate and slept the duration of the night until the next morning."), 47 (explaining that she does not "sleep hard" and "was barely asleep that night," and that she would have woken up had Petitioner moved).  He was still with her when she left the next day at about 11:00 a.m. or 12:00 p.m.  Id. at 12.

---

N.T. 8/24/22 at 25, 26-27.  Kasheem was "another teenage homeless kid that I was friends with," and he had a room on the third floor of the same house.  Id. at 17, 25.  Ms. Bell and Petitioner slept in the same bed, and she described their relationship as "platonic" and that her teenaged male friends were "like my brothers."  Id. at 10, 18, 27.

Ms. Bell testified that when she left her house the next day, she went to Ms. Whitmore's house with a bag of clothes thinking they were going out "clubbing." N.T. 8/24/22 at 12.  Ms. Bell described Ms. Whitmore as "hysterical" and "crying" over Petitioner's arrest for murder, and that she (Ms. Bell) also became upset because everybody was angry with her and demanded to know what had happened. Id. at 12-13.

Ms. Bell testified that she spoke to a police detective but that she was "treated very nasty." N.T. 8/24/22 at 13.  The detective did not want to take her statement and would not listen to what she had to say. Id. at 13; see also id. at 22 (she did not give a police statement because she was "told to be quiet" by the police).  This occurred on the same day as the Bates murder, and she went to the police station with Petitioner's "whole family." Id. at 22, 23.  When asked why she did not attempt any other contact with detectives or the police, Ms. Bell explained, "I didn't -- I just felt that -- I didn't know what was right, what was wrong." Id. at 23.

Ms. Bell initially testified that she did not recall being interviewed by a defense investigator, N.T. 8/24/22 at 13, but confirmed when shown the Bell Interview (Exhs. 1 & 2) that she was interviewed by the investigator at the Boys Town Juvenile facility. Id. at 14.  She recalled giving the responses memorialized in the Bell Interview and that she may have left Ms. Whitmore's house earlier in the evening than she testified, explaining "I don't recall the exact time and . . . it may have been 8 or 9 at night because it gets dark quick in the summers or the fall.  It gets dark faster." Id. at 15.

Ms. Bell recalled being asked to appear at Petitioner's trial and that she was willing to testify on his behalf. N.T. 8/24/22 at 15, 16.  She explained that she was

detained in a detention center "because I was always getting in trouble when I was juvenile and they kept promising me that they were going to come back and get me," and that she signed various "paperwork like subpoenas and stuff but they never came to pick me up." Id. at 15-16.  Ms. Bell stated that if she had been served with a subpoena at the group home where she was living at the time, she would have come to court.  Id. at 37.[13]

When asked how Petitioner's arrest affected her life, Ms. Bell replied, "I lost my friend.  I didn't have no protection.  I have to live in a world by myself.  He was like having the big brother I never had." N.T. 8/24/22 at 18.  She stated that people kept asking her "crazy things like did I set people up to get them murder[ed]," and that she did not have any responses to the questions and moved out of the neighborhood.  Id. at 19; see also id. at 23-24 (her mother "went bananas" after the incident and "transferred us out of schools and we went into another neighborhood"), 41 (she moved to South Philadelphia and lived there for fourteen years).  Ms. Bell testified that she has not stayed in touch with Ms. Whitmore.  Id. at 19.

When counsel from the District Attorney's Office asked Ms. Bell how she remembered "what otherwise may have been a random night in October of 1997," Ms. Bell responded, "I remember because this day like I said it shattered our lives, his and

---

[13]When asked if there was any way she could determine where she was at the time of Petitioner's trial in February 1998, Ms. Bell responded, "I may still have been at the group home [Boys Town]. . . .  When I went inside of Boys Town there was no snow on the ground.  When I came out [of] Boys Town there was snow on the ground."  N.T. 8/24/22 at 41.

mine." Id. at 22.[14] She said she last saw Petitioner when she was sixteen years of age, on the morning they woke up at 40th and Spring Garden Streets and said goodbye. Id. at 28. Ms. Bell explained that she could not visit him in jail because she was "getting locked up or getting put somewhere for acting out," and she started having problems with "[l]ife, everything, the neighborhood, kids at school." Id. at 27, 28. She also explained that they did not communicate with cellphones because they were too young to own them at the time. Id. at 43.

Lastly, Ms. Bell testified that she currently lives in New York and is not aware of current criminal charges against her in the City of Philadelphia. N.T. 8/24/22 at 35. She stated that nobody from the Philadelphia District Attorney's Office had spoken to her about pending charges against her in relation to Petitioner's matter, and that she had not been offered anything in relation to any pending charges she may have. Id. at 35-36.[15]

---

[14]Counsel later apologized for referring to October, telling Ms. Bell on the witness stand, "I apologize to you and the court I kept saying the crime happened in October. It didn't. Happened in February. I apologize." N.T. 8/24/22 at 35. When the court further inquired as to Ms. Bell's recollection of the weather, Petitioner explained:

> It just felt cold, like how it is in October, like when
> Halloween is over and it gets like chilly at night. For that to
> be a February day it [w]as really nice. It was warm. You
> didn't need a coat. We had spring jackets on. . . . It was still
> leaves falling off the trees, it wasn't cold. It was no snow. It
> was nothing. All I can remember about the date is the sun
> was out and we were just happy to be outside. We didn't
> have school. We can run all through the neighborhood.
> Smoke weed all day. We had no responsibilities and we
> could just do what we wanted to do. That's all we knew.

Id. at 38-39.

[15]There is no evidence in the record of any charges pending against Ms. Bell.

Ms. Bell presented as a credible witness.  Her recollection of critical events has remained consistent for nearly twenty-five years, as evidenced by her investigation interview (Hearing Exh. 1, dated November 24, 1997), her affidavit (Hearing Exh. 3, dated February 14, 2018), her interview with CIU Special Assistant Murphy and two assistant district attorneys (Hearing Exh. 4, interview conducted on September 9, 2019), and her testimony at the August 24, 2022 evidentiary hearing.  N.T. 8/24/22 at 7-47.

Ms. Bell's demeanor on the stand lent further weight to her credibility.  Despite challenges to her life from an early age, including at least some period of time living on her own as a teenager in Philadelphia, see N.T. 8/24/22 at 20, 25-26, there was nothing about Ms. Bell's demeanor, tone, or language at the evidentiary hearing to suggest that her testimony contained hyperbole or subterfuge, or that she testified out of fear or undue influence of any kind.  Although Ms. Bell and Petitioner were best friends at the time of his arrest for the Bates murder, at the evidentiary hearing she testified that she had not seen Petitioner since they were about sixteen years of age, when they said goodbye to each other on the morning of his arrest, and that she did not visit him in prison.  Id. at 8-9, 27-28.  I observed nothing about their interaction at the hearing to suggest that Ms. Bell and Petitioner had any current relationship.[16]

---

[16]When asked at the hearing how often Petitioner went against his mother's wishes, Ms. Bell responded, "Every day until now."  N.T. 8/24/22 at 31.  While that response could suggest ongoing knowledge of Petitioner's behavior, instead the phrase appeared to be a colloquial saying and not a statement of her actual knowledge of Petitioner's behavior up to the present day.

This is not to say that Ms. Bell's testimony contained no inconsistencies or dubious recollections.  However, such problem areas involved minor details and are largely reconcilable.  For example, to the extent Ms. Bell's recollection is unclear as to the precise time she and Petitioner left the house where he resided with Ms. Whitmore, how long they stayed at the arcade, or when they arrived at 40th and Spring Garden Streets where she lived and where they slept, the inconsistent times were unsurprising given the typical nature of the evening's activities for teenagers in their neighborhood as Ms. Bell described, and given the passage of years.  Although various accounts place the movement of Ms. Bell and Petitioner at different times, all of the evidence indicates that they left Ms. Whitmore's house together in the evening hours and arrived at Ms. Bell's house together sometime later but before the Bates murder which occurred after midnight, and that they fell asleep in the same bed in Ms. Bell's house and did not leave until the next morning.

Similarly, although Ms. Bell testified that the night in question fell in October rather than February, see N.T. 8/24/22 at 9, the error did not undermine her credibility, particularly given the passage of time.  It was the shock of Petitioner's arrest and the upheaval caused by his disappearance from her life that made the night stand out in her mind, rather than the month or season.  Id. at 22.  Ms. Bell's Investigation Interview occurred on November 24, 1997, see Exhs. 1 & 2, and Petitioner's attorney identified Ms. Bell as a potential defense witness by letter dated November 21, 1997 (Hearing Exh. 6 at 3), and surely Ms. Bell knew at that time that the Bates murder occurred several months earlier rather than the previous month.  I took her inconsistencies as to the weather and

temperature as more indicative of attempts to reconcile her testimony than lack of recall or candor.

Of somewhat greater concern was the fact that Ms. Bell recalled that she learned of Petitioner's arrest from Ms. Whitmore on the day following the early-hours shooting, which was February 17, when the evidence from the police was that Petitioner was not arrested until sometime on February 18.  See Doc. 77 at 25-26.  Nevertheless, I conclude that Ms. Bell's recall of the salient events was not seriously diminished by this discrepancy.

Other discrepancies in Ms. Bell's testimony were less significant.  For example, although the reason Ms. Bell gave for why Ms. Whitmore told them to leave her house that night differs from Ms. Whitmore's testimony (which I will summarize in the next section), the testimony of both women indicates that there was tension between Ms. Whitmore and Petitioner, her boyfriend, when he and Ms. Bell left Ms. Whitmore's house.  It would not be reasonable to expect Ms. Bell to know the precise reason they were told to leave, given that Ms. Whitmore, and not Ms. Bell, shared the home with Petitioner and that they had a baby together.  Similarly, Ms. Bell's belief that Ms. Whitmore and Petitioner's baby girl was present at Ms. Whitmore's house that night, whereas Ms. Whitmore testified that she was pregnant with Petitioner's baby at the time, did not damage Ms. Bell's core credibility.  Both witnesses testified that Ms. Whitmore's house was a typical hang-out location for young people in the neighborhood and that Ms. Whitmore's young niece "TT" was present on the night in question, which suggests that there may have been other young people present at the house at various times.

Ms. Bell's testimony appeared inconsistent regarding Petitioner's state of intoxication on the night in question, as on the one hand Ms. Bell indicated that she did not know precise times because "we were so intoxicated," Bell Inter. at 4, but she testified that Petitioner did not drink alcohol and had not been drinking.  N.T. 8/24/22 at 29.  However, Ms. Bell's testimony that "we" referred to her and Kasheem and not to Petitioner, id. at 44, appeared genuine, particularly her explanation that the interviewer had not asked her about a particular person and so she used "we" in the general sense of a group of teenagers hanging out and drinking, smoking marijuana, and/or taking pills.  She also testified that Petitioner "tried to smoke weed," id. at 29, and although it is not clear if she was referring to the night in question or generally, in either case she did not appear to be trying to paint Petitioner in a falsely positive light.

For all the above reasons I find that Ms. Bell presented as a credible witness.

>        2.     Jadean Whitmore

At the August 24, 2022 evidentiary hearing, the parties entered into evidence two prior statements made by Ms. Whitmore; a police interview of her conducted on February 17, 1997, see Investigation Interview Record of Jadean Whitmore (Hearing Exh. 7) ("Whitmore Statement"), and an affidavit dated May 7, 2018.  See Affidavit of Jadean Whitmore (Hearing Exh. 8) ("Whitmore Aff.").

The shooting occurred at approximately 12:50 a.m. on February 17, 19997, and Ms. Whitmore's police statement took place at 6:40 p.m. later the same day.  Whitmore Statement at 1.  Ms. Whitmore stated that she fell asleep before 11:00 p.m. the previous evening (i.e., February 16), and that she heard about the shooting when her brother Ricky

Smith, who witnessed the shooting, came in through her window and asked if she heard shooting, which she did not.  Id. at 1-2.  Mr. Smith told her that a man from a gray car knocked on a house on the same block as Ms. Whitmore's, and when the man returned to the car two armed men with long coats came out from a lot and started shooting at the gray car and then ran back into the lot.  Id.  Ms. Whitmore also reported that Petitioner came home at 11:00 a.m. the next morning, and when she told him about the shooting, he told her that a person had told him that two shooters came out of Omar Goldwire's mother's house and returned to it.  Id. at 2.

In her May 2018 affidavit, Ms. Whitmore stated that she and Petitioner had been together for several years prior and that she was five months pregnant with his daughter at the time of his arrest for the Bates murder, and that he mostly lived with her on Mt. Vernon Street but sometimes stayed at his mother's house.  Whitmore Aff. ¶¶ 1, 2.  Ms. Whitmore explained that Petitioner left her house with Ms. Bell on the night of the murder and that neither came back that night.  Id. ¶ 2.  Then,

> [on] the day [Petitioner] was arrested our mutual friend, June
> Bell, came over to my house.  I was upset that [Petitioner]
> had been arrested and when I told June about it she became
> very upset. . . .  [S]he immediately said it couldn't have been
> him who committed the murder because he was with June and
> her friends at her place that whole night.

Id.  Ms. Whitmore stated that Ms. Bell "assured me that she would be willing to do whatever she could to help [Petitioner], but she disappeared and never showed up for the trial."  Id.  No investigator or lawyer for Petitioner spoke to Ms. Whitmore about what she knew, and she was and remains willing to testify on his behalf.  Id. ¶ 3.

20

At the evidentiary hearing, Ms. Whitmore testified that she has known Petitioner for more than twenty-five years and has a daughter by him, and that at the time of the Bates murder she was pregnant with that daughter, "within a relationship." N.T. 8/24/22 at 48, 54.[17] She stated that Petitioner lived full time with her, but also that he "split time" between her house and his mother's house. Id. at 48, 55; see also id. at 63 (explaining that Petitioner "usually goes up to his mom's house for a rest period").

Ms. Whitmore testified that on the evening in question, Petitioner and some friends including Ms. Bell were at her house, "[s]itting in my house watching movies, eating as usual," and that they left "to go hang out." N.T. 8/24/22 at 48-49, 54. She thought her niece TT was present but was not sure. Id. at 59-60. It was normal for Petitioner and Ms. Bell to hang out together. Id. at 63. Petitioner and Ms. Bell left "like 7 going further into darkness." Id. at 54, 56-57. She did not ask Petitioner to leave her house that night and did not want him to leave. Id. at 62. Petitioner did not return to her house during the night. Id. at 55, 60.

Ms. Whitmore testified that she learned about the Bates murder when her brother Ricky Smith woke her up and told her about it. N.T. 8/24/22 at 48, 49. Mr. Smith had been outside and was banging on her door when he noticed two guys in long coats shooting at a car, and he then climbed through her downstairs window and went to her

---

[17]Ms. Whitmore testified that she has ten children, but that the daughter she was pregnant with at the time is the only child connected to Petitioner. N.T. 8/24/22 at 54. Ms. Whitmore further testified that at the time she and Petitioner were together, her other children were with her mother. Id. at 59.

bedroom, woke her up, and told her about the shooting which occurred in front of her house.  Id. at 49, 61.

Ms. Whitmore saw Petitioner the next morning at approximately 11:00 a.m.  N.T. 8/24/22 at 50.  She told him what her brother had told her, after which Petitioner left and went to his mother's house, id. at 50, 62.  The police came to her house looking for Petitioner in connection with the murder, "and I'm like that's impossible."  Id. at 62. When asked for her reaction on news of Petitioner's arrest, Ms. Whitmore responded, "I knew he was innocent.  I knew he didn't do it.  I knew he was with a female [Ms. Bell] all day because she told me that's who she was with.  He was with her all night."  Id. at 50.  Ms. Whitmore explained that Ms. Bell came to her house that morning and was shocked that Petitioner was being accused of murder because he had spent the night with her and two other guys at her house.  Id. at 50, 56.  Ms. Whitmore also explained that her brother (Mr. Smith) knew Petitioner and told her that Petitioner was not one of the two guys he saw shooting at a car.  Id. at 53.[18]

Ms. Whitmore testified that she was not contacted by Petitioner's defense lawyers and did not receive a subpoena to testify at trial, and that she was willing to testify on his behalf.  N.T. 8/24/22 at 51, 55.  When asked by the court about the statement in her affidavit that Ms. Bell failed to show up for Petitioner's trial, Ms. Whitmore stated, "She disappeared, she didn't show up and it was because somebody bullied her not to because

---

[18]As noted in my prior R&R, Mr. Smith testified at Petitioner's trial that Petitioner was not one of the shooters he saw.  Doc. 77 at 23-24.

she told me she was going to court for [Petitioner] because she knew where he was at but somebody must -- somebody threatened [Ms. Bell] and she just disappeared." Id. at 64. Ms. Whitmore clarified that Ms. Bell told her about the threats not at the time but after Ms. Bell resurfaced "probably ten years" or more later. Id. at 64-65. Ms. Whitmore stated that she and Ms. Bell are still in contact. Id. at 65.

Ms. Whitmore visited Petitioner in prison "[q]uite a few times," the last time being more than twenty years ago when she took their baby daughter to see him. N.T. 8/24/22 at 57. Ms. Whitmore learned through her daughter that Petitioner had been released on parole, and the evidentiary hearing was the first time Ms. Whitmore had seen him since his release. Id. at 58.[19]

Ms. Whitmore also presented as a credible witness. Like Ms. Bell, Ms. Whitmore's recollection of key events has remained consistent for over twenty-five years, as evidenced by her police interview (Hearing Exh. 7, dated February 17, 1997), her affidavit (Hearing Exh. 8, dated May 7, 2018), and her testimony at the August 24, 2022 evidentiary hearing. N.T. 8/24/22 at 48-65. Indeed, there were no internal inconsistencies in her statements and testimony.

Ms. Whitmore's demeanor on the witness stand lent weight to her credibility. Her attitude toward Petitioner was neutral if not angry, as for example she made little to no eye contact with him and did not display any affection, even though she had not seen him

---

[19]It is unclear if the daughter referenced by Ms. Whitmore is the daughter she had with Petitioner, and when asked if her daughter had seen Petitioner, Ms. Whitmore responded, "I couldn't tell you. I haven't talked to my daughter in a minute." N.T. 8/24/22 at 58.

since she took their baby girl to visit him in prison more than twenty years earlier.  N.T. 8/24/22 at 57, 58.  Ms. Whitmore's neutral attitude toward Petitioner suggested that her willingness to testify on his behalf was not motivated by emotional attachment or familial bonds, but rather her consistent belief that he was with Ms. Bell on the night of the Bates murder and had nothing to do with the crime.  Moreover, there was no suggestion that Ms. Whitmore was pressured, threatened, or promised anything related to her testimony.

Differences between Ms. Whitmore's testimony and that of Ms. Bell were minor and for the most part easily reconcilable, as discussed in the previous section.  The only significant areas of disagreement involved whether Ms. Ms. Whitemore's and Petitioner's young daughter was present and the reason for Ms. Bell's failure to appear and testify at Petitioner's trial, and whether Ms. Bell and Ms. Whitmore have kept in touch and remain friends.  However, these discrepancies did not serve to undermine Ms. Whitmore's credibility as to the key issues.

At the hearing, Ms. Bell testified that she failed to appear at Petitioner's trial because no one came to pick her up, and that she would have testified.  Bell Int. at 7; N.T. 8/24/22 at 15-16, 37.  However, Ms. Whitmore testified that when Ms. Bell resurfaced years after Petitioner's trial, she told Ms. Whitmore that "somebody threatened [Ms. Bell] and she just disappeared."  N.T. 8/24/22 at 64.  I did not find these differences to detract from Ms. Whitmore's credibility, but in any event the different explanations are not as great as they first appear.  In addition to testifying that she did not appear at trial because no one came to pick her up from the group home, id. at 15-16, Ms. Bell also reported in her prior statements that she had been visited in the group home and threatened that she

24

would be prosecuted for the Bates murder if she did not reveal who was responsible.  Bell

Aff. ¶ 2; Murphy Aff. ¶ 3c.  It is entirely plausible that both are true from Ms. Bell's

perspective, and that Ms. Whitmore correctly recalled what she learned from Ms. Bell.[20]

    For all these reasons, I find that Ms. Whitmore presented as a credible witness,

and credibly corroborated Ms. Bell's testimony about Petitioner's whereabouts at the

time of the murder.

    **C.**    **Habeas Relief Should Be Granted**

    In my August 27, 2021 R&R, in considering whether Petitioner met the prejudice

prong of <u>Strickland</u>, I considered the parties' stipulation that the alibi witnesses'

"testimony would have been sufficiently credible such that it likely would have raised a

reasonable doubt as to [Petitioner]'s guilt."  Doc. 77 at 27-34.  On remand, having heard

from the alibi witnesses and having found their testimony credible, and substituting my

credibility findings for the parties' stipulation, I conclude that Petitioner has met his

burden under <u>Strickland</u> to show that counsel was deficient in failing to call the alibi

---

[20]In a related apparent discrepancy, Ms. Whitmore testified that she and Ms. Bell are still in contact, <u>N.T.</u> 8/24/22 at 65, whereas Ms. Bell testified that she has not stayed in touch with Ms. Whitmore.  <u>Id.</u> at 19.  Again, this discrepancy does not affect my credibility determinations, and in any event may be reconciled.  Ms. Bell stated that she did not have contact with Ms. Whitmore in the context of questioning as to what happened after the Bates murder, and Ms. Bell explained that she moved out of the neighborhood and that she lived in South Philadelphia for fourteen years.  <u>Id.</u> at 19, 23-24, 41.  This absence from the neighborhood is consistent with Ms. Whitmore's testimony that Ms. Bell resurfaced "probably ten years" or more after the murder.  <u>Id.</u> at 64-65.  The murder happened over twenty-five years ago, and it may be that Ms. Bell and Ms. Whitmore did not stay in touch for many years after the murder, and then resumed some degree of contact at some point.  It did not appear that the two witnesses had discussed their testimony with each other.

witnesses at trial, and that there is a reasonable likelihood that their testimony would have led to a different verdict.  I therefore recommend that relief be granted on Ground Four.

## II.   **CONCLUSION**

Ms. Bell presented as a credible alibi witness, and Ms. Whitmore credibly corroborated Ms. Bell's testimony in material respects.  Therefore, trial counsel's failure to present these known witnesses was unreasonable and caused prejudice insofar as their testimony would likely have changed the outcome of the trial for the reasons stated in my August 27, 2021 R&R.

Accordingly, I make the following:

## R E C O M M E N D A T I O N

AND NOW, this  27th      day of October 2022, IT IS RESPECTFULLY RECOMMENDED, for the reasons stated in my April 27, 2021 R&R, as amended herein, that the petition for writ of habeas corpus be GRANTED with respect to Petitioner's claim of ineffective assistance of counsel for failing to investigate and present testimony from alibi witnesses.  I further RECOMMEND that execution of the writ be STAYED for 180 days to permit the Commonwealth to retry Petitioner.

BY THE COURT:

/s/ Elizabeth T. Hey

_____

ELIZABETH T. HEY, U.S.M.J.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MONTRELL OLIVER | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| BARRY SMITH, et al. | : | NO.  16-5537 |

## O R D E R

AND NOW, this          day of                  , 202 , upon careful and

independent consideration of the petition for writ of habeas corpus and associated

briefing, and after review of the Report and Recommendation of United States Magistrate

Judge Elizabeth T. Hey, as amended, IT IS ORDERED that:

1. The Report and Recommendation, as amended, is APPROVED AND ADOPTED.

2. The petition for writ of habeas corpus is GRANTED with respect to Petitioner's claim of ineffective assistance of counsel ("IAC") for failing to investigate and present testimony from alibi witnesses.

3. Execution of the writ is STAYED for 180 days to permit the Commonwealth to retry Petitioner.

4. In all other respects, the writ is DENIED.

5. A certificate of appealability shall not issue.

BY THE COURT:

_____
MITCHELL S. GOLDBERG, J.